*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0384p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

—————————————

GARY VAN JOHNSON,

　　　　　　*Petitioner-Appellant,*

　　*v.*

No. 00-3350

BETTY MITCHELL, Warden,

　　　　　　*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 97-00858—Donald C. Nugent, District Judge.

Argued: December 6, 2007

Decided and Filed: November 4, 2009

Before: DAUGHTREY, MOORE, and GILMAN, Circuit Judges.

—————————————

**COUNSEL**

**ARGUED:** Timothy F. Sweeney, LAW OFFICE OF TIMOTHY FARRELL SWEENEY, Cleveland, Ohio, for Appellant. Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Timothy F. Sweeney, LAW OFFICE OF TIMOTHY FARRELL SWEENEY, Cleveland, Ohio, Michael J. Benza, LAW OFFICE OF MICHAEL J. BENZA, Chagrin Falls, Ohio, for Appellant. Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

—————————————

**OPINION**

—————————————

　　MARTHA CRAIG DAUGHTREY, Circuit Judge. Following his convictions in Ohio state court for aggravated robbery and aggravated murder, with specifications, Gary Van Johnson was sentenced to death. After exhausting his direct appeals, as well as avenues for state collateral relief, Johnson petitioned for habeas relief in federal court under the provisions of 28 U.S.C. § 2254. Denied the relief he desired, the petitioner now appeals to this court and raises numerous claims of constitutional error, including arguments involving

1

alleged (1) insufficiency of the convicting evidence, (2) improper withholding of impeachment evidence by the prosecution, (3) prosecutorial misconduct, (4) failure of the trial judge to declare a mistrial, (5) ineffective assistance of counsel at the guilt phase of the trial and (6) at the penalty phase of the trial, and  (7) improper failure of the district judge to recuse himself from the habeas proceedings.  Although we find no merit to the other issues raised on appeal for the reasons expressed below, we conclude that Johnson's trial attorney did not provide his client with effective assistance of counsel during the penalty phase of the trial.  As a result, we find it necessary to reverse the district court's judgment and remand the case for further proceedings.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

In addressing the petitioner's conviction in Ohio state court, the Supreme Court of the State of Ohio summarized the relevant facts and the initial procedural history of the case as follows:

> The appellant, Gary Johnson, was indicted on May 4, 1983, for aggravated murder and aggravated robbery. The aggravated murder charge included specifications that the appellant was committing or attempting to commit or fleeing immediately after committing or attempting to commit aggravated robbery, and that the defendant had a firearm on or about his person or under his control while committing the offenses charged within the indictment.

> The case went to trial for the first time on October 3, 1983. Appellant was convicted of both charges and at the conclusion of the penalty phase the jury recommended the death penalty. The trial court adopted the jury's recommendation and imposed the death sentence.

> However, the majority of this court held that the appellant was denied his constitutional right to effective assistance of counsel because of defense counsel's failure to investigate appellant's background for the purpose of presenting evidence in mitigation at the penalty phase of the trial, and counsel's failure to object to the inclusion in the indictment of the firearm specification and its submission to the jury at both the guilt and penalty phases of the proceedings. Also, we found that the trial court erred in denying the appellant's request for a continuance, based on newly discovered evidence at the guilt phase of the proceedings. Therefore, appellant's convictions were reversed, his sentence was vacated and the cause was remanded for a new trial. *State v. Johnson [(Johnson I)*, 494 N.E.2d 1061 (Ohio 1986)].

> The case was retried beginning November 12, 1986, and the following evidence was adduced.

Steven Graster testified that his wife, Eunice Graster (the victim) had been employed as a desk clerk at the Reno Hotel in Cleveland since the end of 1982. The Reno Hotel, where the victim was murdered, was primarily used for prostitution and other sexual liaisons. On Tuesday, April 26, 1983, Eunice was working the 7:00 a.m. to 3:30 p.m. shift as the clerk at the Reno Hotel. There were five couples in the hotel during her shift; however, registration records showed that four couples had checked out, leaving only one of these five couples, Mr. and Mrs. Sid Arnold, in Room 23. Eunice's husband, Steven, testified that he arrived at the hotel with their two children at approximately 9:25 to 9:30 to pick up a W.I.C. coupon book from Eunice. (W.I.C., Women, Infants and Children, is a federally subsidized basic nutrition program.) He had a 10:00 a.m. appointment to take their two children to the W.I.C. clinic at Miles and Broadway to participate in the nutrition program. Apparently, Eunice had the program booklet at work and Steven's purpose in visiting her was to obtain the booklet from his wife. Steven remained at the hotel for approximately ten or fifteen minutes.

While Steven was talking to his wife, he noticed the appellant come into the north doorway to the main entrance of the hotel. In order to allow entry into the hotel, Eunice had to "buzz in" the appellant through a second and a third set of doors. Appellant proceeded to a room used as an employees' lunchroom. Shortly after this, Steven left to keep his 10:00 appointment at the W.I.C. clinic. The records of the W.I.C. clinic show that Steven was on time for his appointment.

Upon arriving at the W.I.C. clinic with his two children, Steven believed he needed his wife's welfare card, so he called the hotel twice but received no answer. He then left the clinic at 10:38 a.m. When Steven got home he phoned the hotel for the third time and reached Ganelle Johnson, the hotel manager, who notified Steven that she did not know where Eunice was. Steven then gathered up his two children and drove back to the Reno Hotel. When he arrived he learned that his wife was dead. Sergeant William Manocchio observed Steven become hysterical and punch a hole in the wall upon finding out about his wife.

Appellant's aunt, Vera Lundy, was a maid at the Reno Hotel. On April 26, her shift began at 10:00 a.m. Upon arriving early, she went to a nearby restaurant for coffee. Lundy testified that a couple of minutes before 10:00 she left the restaurant and headed for the hotel. At the north entrance to the hotel she encountered a couple who told her that they had been trying to get into the hotel for fifteen minutes. Lundy rang the doorbell and pounded on the door, but received no response. She went to the back of the hotel and looked through a window, but observed nothing. When she returned to the front of the hotel she saw that one of the double doors was open and appellant was walking down the front steps. Lundy testified that she noticed that appellant had a brown envelope resembling those used by the hotel for cash receipts. However, during cross-examination, she admitted that she had

not remembered, when asked prior to trial, whether appellant had anything in his possession.

According to Lundy, she asked the appellant to go into the hotel with her to find Eunice, and the appellant replied that "he wasn't going back into the hotel, Dee [appellant's father, Robert Johnson, owner of the hotel] wasn't going to blame him for anything that happened in the hotel."

Two Cleveland vice officers, Detectives William Reiber and Edward Kelley, who had been watching the hotel, corroborated Lundy's story by testifying that they saw the appellant converse with Lundy and also noticed a yellow envelope in his possession.

Detective Sergeant John McKibben testified that appellant told him that he had not been on the front porch at all and had no conversation with Lundy. However, later appellant testified that he responded to Lundy's request to come inside by saying, "No, you just told me yesterday Ganelle [appellant's sister and the hotel manager] said not to hang around Eunice's shift. You want me to get in some trouble." John Williams, who was blacktopping the hotel's parking lot that day, overheard the conversation between Lundy and the appellant, and corroborated the appellant's version.

Around 10:00 a.m., Lundy called Ganelle. According to Ganelle, Lundy was nervous, upset, and close to tears. Lundy told Ganelle she could not get into the hotel and could not find Eunice. Ganelle instructed Lundy to go back and ring the doorbell again and she would phone the hotel switchboard. Ganelle then phoned the hotel, hoping to reach Eunice, but received no answer. Meanwhile, Lundy summoned the Cleveland police, and called Ganelle again. Ganelle characterized Lundy as "hysterical" at this point. During the second conversation, according to Ganelle, Lundy said: "I saw Gary [the appellant] coming out of the hotel." On cross-examination, however, Lundy conceded that she had testified in the first trial in 1983 that she had not told Ganelle about seeing appellant coming out of the hotel.

When Ganelle arrived at the hotel, she discovered that the door to the office which was usually locked had been forced open, splintering the door jamb. Upon entering the room, she found that all the receipts she had put on a desk the day before, including those from the weekend, were gone. She estimated the amount of money missing from the cash box was between $500 and $900. She also discovered that the .38 caliber Smith & Wesson revolver, usually kept in a top drawer of the desk where the money was kept, was missing.

Cleveland police officer Fabian Henderson arrived at the hotel at approximately 10:48 a.m. Officer Henderson and his partner searched for Eunice and eventually found her body in the basement.

While the police were conducting their search, the two customers who had been occupying a room at this time left the premises. Ganelle testified that

they were regular customers, identified by their registration card with the fictitious names of "Mr. and Mrs. Sid Arnold."

An autopsy performed on Eunice showed she had been shot five times and internally bled to death. It was also determined that she was shot with either a .38 or .357 caliber revolver.

At approximately 10:15 a.m. that day, appellant went to the apartment of Bobby and Joyce Carter, which was located above Scotty's Mid-Town City Tavern. He stayed until 8:00 p.m., drinking with the Carters. Joyce testified that appellant had a roll of money an inch thick although he had borrowed money on the previous two days to pay for his room at the Lancer Inn. Joyce went down to the tavern several times to buy drinks, with appellant paying for some or all of them, until Bobby suggested that it would be cheaper to buy a bottle at the liquor store. Appellant gave Joyce $20 to buy liquor and to pick up appellant's suit at a nearby dry-cleaning establishment.

After returning from the errand, Joyce went downstairs to the tavern to make a call on the tavern's pay phone. The owner told her that there had been a killing at the Reno Hotel, whereupon Joyce called Ganelle to find out who had been killed. During the conversation, Joyce mentioned that appellant was in her apartment. Upon returning to her apartment, Joyce told appellant that she had told Ganelle where appellant was, and appellant responded that he "wished I [Joyce] hadn't did it."

Appellant testified on his own behalf at trial. He admitted going through the north door when he entered the hotel, but denied that Eunice buzzed him in any farther than the first set of doors. He claimed his reason for coming to the hotel was to borrow his sister's, Robin Johnson's, car. Further, he testified that he saw Steven assaulting Eunice, "pushing her head back and forth * * * up against the corner of the office door." Appellant asked where his sister Robin was; upon being told that she was not there, he left.

He then testified that he walked to the Playland Bar at 55th and Euclid, then to 65th Street, then turned back and went to King's Bar at 55th and Cedar, and from there walked along Cedar Avenue and turned onto 40th Street, going past the Reno Hotel. At this point, appellant claimed, Lundy called to him and asked him to come into the hotel. From the hotel, he went to the Carters' apartment at 77th and Cedar.

Appellant had given a similar account of his movements to Cleveland police detectives, except that he claimed to have gone from the Reno to the Sterling Hotel at East 40th and Prospect Streets before going to the Carters' residence; he did not mention going to 65th Street.

Finally, appellant denied any part in the murder or robbery of Eunice Graster.

On rebuttal, Ganelle testified about an incident in 1978 when her parents went on vacation and left her in charge of the hotel. Eight hours after her parents left for vacation, appellant threatened and then assaulted Ganelle in order to get the keys to the hotel's cash box. Thereafter, when her parents returned and were informed of the incident, the appellant was told he could not have anything to do with the business end of the hotel. Also, Ganelle testified that, during the investigation of the crime, appellant wanted her to "get close" to Detective Moore to find out what progress the police were making in the case.

After this second trial appellant was once again convicted and sentenced to death. The court of appeals, having performed its statutory independent analysis of the record and the proportionality of the sentence, affirmed the sentence in all particulars.

*State v. Johnson (Johnson II)*, 545 N.E.2d 636, 637-40 (Ohio 1989).

The Ohio Supreme Court affirmed Johnson's conviction and his death sentence, *see id.* at 640, and the United States Supreme Court denied his petition for certiorari. *See Johnson v. Ohio*, 494 U.S. 1039 (1990). After collateral proceedings in state court also proved unsuccessful, Johnson filed a petition for a writ of habeas corpus in federal district court, raising 22 claims and also requesting that the district judge recuse himself from the matter because he had previously served in the Cleveland prosecutor's office. The court denied relief and concluded that Johnson was not entitled to a certificate of appealability because he had failed to make a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). However, we subsequently entered an order authorizing an appeal on the following issues:

Whether Johnson's counsel was ineffective in not timely objecting when the prosecutor, in his guilt-phase closing, argued that the crime had been committed by a left-handed person and that Johnson was left-handed;

Whether the prosecutor, in his guilt-phase closing, committed misconduct when he argued that the crime had been committed by a left-handed person and that Johnson was left-handed;

Whether Johnson's trial counsel was ineffective in the penalty phase by conducting an inadequate investigation and failing to present certain mitigating evidence;

Whether the prosecutor committed misconduct by withholding the police statement of Vera Lundy, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny;

Whether counsel was ineffective at the penalty phase of trial in presenting a wholly inadequate closing argument;

Whether the trial court erred in denying a mistrial after the prosecutor, in his guilt-phase closing, argued that the crime had been committed by a left-handed person and that Johnson was left-handed;

Whether there was sufficient evidence to support the convictions;

Whether the aggravating circumstance was supported by constitutionally sufficient evidence; and

Whether the district court judge erred in denying the motion to recuse himself.

## II.  *DISCUSSION*

Johnson's petition is subject to review under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L.No. 104-132, 110 Stat. 1214 (1996), under which a federal court may not grant the writ unless the state court adjudication on the merits either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  As explained by the United States Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000):

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

In deciding whether a state court ruling involved an "unreasonable application" of federal law, a habeas court does not focus merely upon whether the state court decision was erroneous or incorrect; rather, a federal court may issue a writ of habeas corpus only if the state court's application of clearly-established federal law was objectively unreasonable. *See id.* at 409-11.  Furthermore, "[t]his court reviews a district court's legal conclusions in a

habeas proceeding *de novo* and its factual findings for clear error." *Greer v. Mitchell*, 264 F.3d 663, 671 (6th Cir. 2001) (citing *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999)).

**1.** *Sufficiency of the Convicting Evidence*

In analyzing a challenge to the sufficiency of the convicting evidence, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In doing so, moreover, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. *See United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993).

Nevertheless, Johnson urges us to do exactly what is prohibited:  to reweigh the evidence adduced at trial; to determine that certain witnesses should not be deemed credible; and to substitute our judgment for that of the trial court.  For example, the petitioner contends that the circumstantial evidence offered at trial should have been accorded less weight by the jury than the absence of certain "hard" evidence.  Johnson emphasizes that the prosecution offered no physical evidence connecting him to the crime: no fingerprints or footprints that belonged to Johnson in the dusty basement where the victim was murdered, nor any dust, dirt, blood, or gunshot residue on the petitioner's clothing or on the petitioner himself, again, despite the fact that the murder occurred in a dusty environment and involved multiple discharges of a firearm in close quarters.  Additionally, the prosecution produced at trial no eyewitness to the shooting, no confession by the petitioner, no murder weapon, and no testimony that Johnson had ever previously robbed or shot someone.  Although, individually and collectively, those arguments might be persuasive if made to a jury, we are now held to a higher standard, *i.e.*, not whether we would find the evidence sufficient to convict the petitioner of the charged offenses, but whether the state court was unreasonable in concluding that a rational trier of fact could so find.

A conviction for aggravated murder under section 2903.01(B) of the Ohio Revised Code requires, in relevant part, that the jury find that the defendant purposely caused the death of another individual "while committing or attempting to commit . . . aggravated robbery."  In turn, "aggravated robbery" is, in part, defined by Ohio statutes as the

commission of a theft offense while possessing or using a deadly weapon. *See* Ohio Rev. Code § 2911.01(A)(1). Because a theft occurs under Ohio's criminal laws when one person deprives another of property or services without consent, or by threat or intimidation, *see* Ohio Rev. Code §§ 2913.02(A)(1), (4), or (5), Johnson could have been convicted of the aggravated murder of Eunice Graster if the jury determined, beyond a reasonable doubt, that he shot her in the basement of the Reno Hotel in furtherance of the theft of the receipts from the hotel's office.

In support of such a theory, the testimony of the victim's husband put Johnson inside the hotel's locked doors shortly before the time Graster was murdered, despite the petitioner's denial that he had entered through the second set of locked doors on the morning of the murder. Furthermore, shortly thereafter, the petitioner was observed on steps leading from a hotel door not used by the general public and able to be opened only from *inside* the building. At that time, Johnson was carrying a brown envelope similar to the envelopes that the hotel clerks routinely used to hold business receipts. Johnson was also heard to say to his aunt that he did not wish to re-enter the hotel because he didn't want to be blamed for anything that might have happened in the hotel. Finally, even though the petitioner had borrowed money the previous days just to pay for cheap lodging, he was seen after the murder and robbery with a roll of paper money estimated to be at least one-inch thick.

Despite Johnson's contention that the testimony concerning his possession of a brown envelope like that in which the stolen receipts were kept was "too convenient to be credible," that only one witness saw him on the front steps of the hotel, and that the statement that he did not want to re-enter the hotel or be blamed for anything that happened in the business was ambiguous, that evidence, combined with other testimony and inferences viewed in the light most favorable to the prosecution, would indeed justify a rational trier of fact in finding Johnson guilty of aggravated robbery and aggravated murder. Again, the fact that we might not have reached such a conclusion is not determinative of the issue. Rather, as long as the Ohio Supreme Court's ruling that substantial evidence introduced at trial proved Johnson's guilt of aggravated robbery and aggravated murder beyond a reasonable doubt was neither contrary to, nor an unreasonable application of, settled Supreme Court jurisprudence, the petitioner is not entitled to a grant of relief on this issue.

**2.  *Withholding of Evidence***

Citing  *Brady v. Maryland*, 373 U.S. 83 (1963), the petitioner nevertheless argues that the prosecution's case would have been effectively undermined had the state not withheld evidence that would have tended to exonerate him or at least cast doubt on the credibility of one of the chief witnesses against him, Vera Lundy.[1]  In *Brady*, the United States Supreme Court imposed upon the prosecutorial arm of the government the "obligation to turn over material that is both favorable to the defendant and material to guilt or punishment."  *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir. 1994). "Moreover, it is well-settled that this disclosure obligation includes evidence that could be used to impeach the credibility of a witness." *Schledwitz v. United States*, 169 F.3d 1003, 1011 (6th Cir. 1999) (citing *Giglio v. United States*, 405 U.S. 150, 154-55 (1972)). Nevertheless, a *Brady* violation will not result in a grant of relief unless the court concludes that the improperly-withheld evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

Focusing solely upon the allegedly contradictory statements offered by Vera Lundy, the petitioner notes Lundy's testimony at Johnson's trial that he was carrying a brown envelope when she saw him outside the Reno Hotel.  Johnson emphasizes, however, that he later obtained documents showing that Lundy told police immediately after the murder in 1983, "I can't remember if he had anything in his hands."  Without question, revelation of such an inconsistency could serve to undermine the credibility of a strategic witness to the state's effort to tie Johnson to the aggravated robbery at the Reno Hotel.  Even so, earlier "discovery" of Lundy's statement to the police would not have "put the whole case in such a different light as to undermine confidence in the verdict."

---

[1]The petitioner alleges that various other items of information were also withheld by the prosecution, but the certificate of appealability covers only Lundy's statements made to police.  As a result, the others are not subject to review on appeal.  28 U.S.C. §§ 2253(c)(1), (2), and (3).

In fact, in his brief on appeal, Johnson readily admits "that Lundy was impeached by the inconsistencies between her testimony in the two trials." Yet he insists that additional impeachment of Lundy with her police statement should have been allowed, given the importance of the witness in the prosecution's case. But the record shows that, in addition to defense counsel's cross-examination of Lundy regarding the inconsistencies in her testimony about the petitioner's possession of a brown envelope, police officers William Reiber and Edward Kelley both testified at trial that on the morning in question, they too had observed Gary Johnson leaving the Reno Hotel carrying a "yellow" envelope similar to the kind they later learned were used by the hotel staff. Thus, even if defense counsel had been provided earlier with Lundy's statement to the police in which she could not recall whether Johnson was carrying anything with him when she saw him outside the Reno Hotel shortly after the time Eunice Graster was killed, the prosecution's case would not have been undermined, given the testimony of the two police officers who corroborated Lundy's version of events.

There is even less reason to ascribe significant weight to the second variance between Lundy's trial testimony and information in her statement to the police proffered by the petitioner. Lundy testified at trial that, upon seeing Gary Johnson coming down the steps of the Reno Hotel, she asked him to go into the hotel with her to find the victim, to which Johnson responded that he wasn't going *back* into the hotel, raising the implication that he had previously been inside the premises that morning. Yet, in her statement to the police the morning after the crime, Lundy related that when she saw her nephew "coming down the steps" and asked him to accompany her into the hotel, "[h]e told me that he wasn't going into the hotel," not that he wasn't going *back* into the hotel. The value of this evidence as impeachment is obviously destroyed by the fact that regardless of the slight discrepancy involved, both statements indicate that Lundy saw Johnson "coming out of the hotel." Moreover, testimony from another prosecution witness placed Johnson inside the hotel's locked doors shortly before the time of Eunice Graster's murder. The state court's conclusion that there was no merit to the *Brady*

claim is thus neither contrary to nor an unreasonable application of clearly established federal law as interpreted by the United States Supreme Court.

The petitioner also asserts that the district court erred in not permitting him to engage in further discovery to determine whether the prosecution withheld other crucial exculpatory or impeachment evidence and in not granting him an evidentiary hearing on the matter. We review both a district court's limitation on the scope of discovery and a decision on whether to hold an evidentiary hearing for an abuse of discretion. *See Lott v. Coyle*, 261 F.3d 594, 602 (6th Cir. 2001).

"Habeas petitioners have no right to automatic discovery." *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001). A district court may, however, permit discovery in a habeas proceeding if the "petitioner presents specific allegations showing reason to believe that the facts, if fully developed, may lead the district court to believe that federal habeas relief is appropriate." *Lott*, 261 F.3d at 602 (citing Rule 6(a) of the Rules Governing Section 2254 Proceedings for the United States District Courts; *Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991)). Because Johnson has not satisfied this burden, the district judge did not abuse his discretion in denying the discovery request.

Similarly, "[u]nder AEDPA, evidentiary hearings are not mandatory." *Vroman v. Brigano*, 346 F.3d 598, 606 (6th Cir. 2003). In fact, in determining whether to grant an evidentiary hearing to a habeas corpus petitioner, the district court must decide whether such a hearing would enable the petitioner to prove allegations that, if true, would entitle the applicant to federal habeas relief. *See Hartman v. Bagley*, 492 F.3d 347, 361 (6th Cir. 2007), *cert. denied*, 128 S.Ct. 2971 (2008) (citing *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)). In this case, Johnson has advanced no specific allegations relating to his *Brady* claim that would entitle him to habeas relief. The district court, therefore, also did not abuse its discretion in denying the petitioner's request for an evidentiary hearing in that court.

**3.** *Prosecutorial Misconduct*

In his next assignment of error, the petitioner focuses on the prosecution's argument to the jury that the victim was murdered by a left-handed person and that Johnson was himself left-handed. He first contends that the argument amounted to prosecutorial misconduct because no testimony was offered at the second trial to establish either proposition.

During the state's rebuttal argument during the guilt/innocence phase of the proceedings, a member of the prosecution team stated to the jurors:

> *Eunice Graster was shot by a left-handed person.* She was shot in the back of the head on the left side. The two gunshot wounds to the back are to the left side of the back, and you examine those pants. And there he stood behind her, taller than she, that morning down in that dark basement, and the first shot through her head drove her to her knees, to the back of her, and that's where the dirt came from on the knees. (Emphasis added.)

> The next two shots took her right in the back, and she fell over onto the hose, and he leaned over her there and put the final shot into her left breast, and that's where that one bullet was found in that hose. *The left-handed Gary Johnson, the defendant in this case, ladies and gentlemen.* (Emphasis added.)

Defense counsel offered no immediate objection but, after the conclusion of the argument and after the trial judge's instructions to the jury, he did move for a mistrial on the following basis:

> [T]his is the first available opportunity I have had to address the Court since the prosecutor made his final argument. I'm unaware of any testimony in this record that the defendant was left-handed. Now, I could very well be wrong. There was testimony in the previous trial that the defendant was left-handed. I'm unaware of any testimony in this trial, and that I think is critical because the prosecutor called the defendant left-handed and testified, what I regard as testimony by the prosecutor, that the defendant was left-handed. That became a critical part of his theory in the demonstration he gave the jury, and certainly he has a right to comment on the testimony and path of the bullets and all of that other that is into evidence. But I don't think he has a right to inform the jury that the defendant is left-handed . . . .

The Ohio Supreme Court reviewed this allegation of error on direct appeal only for plain error, reasoning that Johnson "failed to timely object to the prosecutor's comment that [the petitioner] was left-handed," *Johnson II*, 545 N.E.2d 642. However, the district court determined that defense counsel was not, in fact, untimely in noting his objection. As the district judge explained:

> According to defense counsel, he raised the issue regarding the prosecutor's comment at the first available opportunity he had to address the court since the argument was made. At that time, counsel moved for a mistrial and preserved for appeal the issue raised herein. From the discussion among counsel and the trial court during the conference in chambers, it is apparent that there was some confusion as to whether or not evidence was adduced at trial which supported a finding that Petitioner was left-handed. It is likely that because trial counsel was unsure of whether such evidence existed at the second trial, he waited until after closing arguments; this is hardly unreasonable. Also, counsel regularly fail to raise objections during argument for tactical reasons in trying not to antagonize the jury. This is true especially when as is the case here, the statement objected to is an isolated one. In any event, defense counsel did argue this issue on behalf of his client and preserved it for appeal.

We have consistently "held that a state court's plain error analysis does not save a petitioner from procedural default." *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006). Nevertheless, the warden does not now contend that this claim has been procedurally defaulted. Indeed, in her brief, she addresses the issue on the merits without arguing for the application of any procedural shortcuts. Thus, we opt to address the allegation of error on the merits. *See White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2005) ("procedural default is a defense that may be waived if not asserted; it is not a jurisdictional matter and, therefore, we are not obligated to raise the issue *sua sponte*").

Because the state court did not reach the merits of the claim, however, we must conduct our own *de novo* review of the matter. *See, e.g.*, *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003). When examining claims of prosecutorial misconduct, the critical inquiry for this court "is the fairness of the trial, not the culpability of the prosecutor." *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (citing *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). As a result, we must determine "whether the

improper comments or actions 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"   *Id.* at 515 (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).  In doing so:

> [T]his circuit employs a two-prong test. *See United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001).  First, this court determines whether the prosecution's conduct or remarks were improper.  If the answer is affirmative, then the court considers four factors to decide whether the improper acts were sufficiently flagrant to warrant reversal:  (1) whether the evidence against the defendant was strong[;] (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally.

*Id.* at 515-16.

The prosecution's supposition that the murderer must have been left-handed was not an improper comment upon the evidence admitted at trial, amounting, as it did, to nothing more than the state's interpretation of the evidence that had been admitted at trial.  Indeed, defense counsel candidly admitted on the record that the prosecutor "certainly . . . ha[d] a right to comment on the testimony and path of the bullets and all of that other that is into evidence."   Nevertheless, the prosecutor's description of Johnson as left-handed must be considered improper because evidence that Johnson was left-handed, which  had been introduced at the first trial, was not reintroduced at the second.  However, an analysis of the four factors discussed in *Slagle* leads us to the conclusion that the comment, although improper, was not sufficiently flagrant to constitute a violation of due process.

First, the state's case against Johnson consisted largely of circumstantial evidence.  But that evidence, as we have held, was sufficiently strong to justify a rational trier of fact in finding Johnson guilty of aggravated robbery and aggravated murder.  Second, we recognize that, having argued that Eunice Graster was killed by a left-handed individual, the prosecutor's contention that Gary Johnson was, in fact, left-handed was certainly less than helpful to the defense. But, third, the trial judge carefully instructed the jurors that "[t]he evidence does not include the indictment, the opening statements, or the closing arguments of counsel.  Opening statements and the closing

arguments of counsel are designed to assist you, but they were not evidence." Because we must presume that the jurors adhered to the instructions given them, *see, e.g.*, *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993), the possibility that the jurors were misled or that the petitioner was unduly prejudiced by the single, isolated remark made during rebuttal argument is exceedingly slim, especially in light of the other evidence introduced against him. Fourth and finally, in response to the petitioner's motion for a mistrial based upon the improper argument, the prosecutor said that his "recollection of the testimony [in the second trial] is that there is [evidence that Johnson is left-handed]." Although that recollection was proven faulty, the circumstances presented here do not justify a conclusion that the prosecutor intended to inject improper considerations into the proceedings deliberately.

Under these circumstances, we cannot conclude that the prosecutor's single, isolated statement, apparently made unintentionally and not to mislead the jury, was "sufficiently flagrant to warrant reversal." *Slagle*, 457 F.3d at 516.

### 4. *Failure to Declare a Mistrial*

For the same reasons that lead us to conclude that the prosecutor's "left-handed" comments did not deprive the petitioner of a fair trial, we also conclude that the trial judge did not commit an abuse of discretion in failing to grant a mistrial because of those statements. *See Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003) (review of a state court's denial of a mistrial requires application of a high standard: "reversal is not warranted unless the comment 'was potentially so misleading and prejudicial that it deprived [the defendant] of a constitutionally fair trial'") (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 641-42 (1974)).

### 5. *Ineffective Assistance of Counsel – Guilt Phase*

Likewise, the petitioner's allegation that he was denied the effective assistance of counsel during the guilt phase of the trial is based on his contention that defense counsel failed to object to the "left-handed" arguments that the prosecutor made to the jury. But, because we have treated the petitioner's claims regarding prosecutorial

misconduct during final argument as having been properly preserved for review, we have implicitly held that trial counsel did *not* fail to object to the challenged comments in a timely fashion. Thus, there is no basis on which to make a finding of ineffective assistance of counsel at the guilt phase of Johnson's trial.

**6.** *Ineffective Assistance of Counsel – Sentencing Phase*

Johnson alleges that his trial counsel failed to investigate the state's case adequately, failed to present mitigating evidence to the jury, and failed to articulate an effective argument that the mitigating factors outweighed the aggravating factors. In addressing these claims of ineffective assistance of counsel, we are guided by the now-familiar two-part test of *Strickland v. Washington*, 466 U.S. 668 (1984). As required by that analytical framework:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687.

In *Groseclose v. Bell*, 130 F.3d 1161, 1167 (6th Cir. 1997), discussing the first prong of the *Strickland* analysis, we recognized that:

> The [Supreme] Court cautioned that in undertaking an ineffective-assistance review, "[j]udicial scrutiny of counsel's performance must be highly deferential," and must avoid the "second-guess[ing of] counsel's assistance . . ., [as] it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689 . . . . In order to avoid "the distorting effects of hindsight," a reviewing "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* (citation omitted).

Furthermore, in evaluating the prejudice suffered by a petitioner as a result of alleged ineffective assistance of counsel, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Indeed, "[v]irtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* (citation omitted). Rather, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

As recounted in the factual and procedural background of this case, the Ohio Supreme Court reversed Johnson's original conviction and death sentence after the court's examination of the trial transcript led it to the following findings and conclusions:

> [C]ounsel for the defense openly stated to the court that he had not even discussed with his client the penalty aspect of the case. Counsel then asked for, and was given, a ten-minute recess. Following this recess, the trial court, with the acquiescence of defense counsel, set the hearing for the very next day. At the hearing, the defense presented only the unsworn statement of appellant. No mitigating evidence of any kind was offered.

> This scenario, depicting as it does the complete lack of preparation and zeal on the part of defense counsel regarding the question of whether their client should live or die, compels the conclusion that appellant was deprived of any effective, meaningful assistance from his counsel at this obviously critical stage of the proceedings.

> \* \* \* \* \*

> It is quite clear . . . that the duty of defense counsel to investigate his client's background for mitigating factors is an indispensable component of the constitutional requirement that a criminal defendant – and particularly one on trial for his life – be afforded effective representation and assistance from his lawyer. The maladroit presentation offered by appellant's attorneys in the sentencing phase did not, by any standard, meet that requirement. No mitigating evidence of any kind was offered. No continuance was requested for purposes of investigating appellant's background for mitigating factors. The only "evidence" for the defense

heard by the jury was a lengthy unsworn statement by appellant protesting his innocence, followed by a closing argument by defense counsel in a similar vein, actually berating the jurors for their guilty verdict and repeatedly urging them to "reconsider the evidence."

*Johnson I*, 494 N.E.2d at 1063-64 (footnotes omitted).

The same attorney who secured that favorable decision from the Ohio Supreme Court, James Willis, also represented Johnson at the retrial. But, after arguing successfully that Johnson's original attorney had been constitutionally ineffective in failing to present available mitigating evidence at the penalty phase of the proceedings, Willis himself committed the same grievous error. He introduced no mitigating evidence at the penalty phase of the second trial, instead relying solely upon Johnson's unsworn statement to the jury, a statement in which the petitioner chastised the finders-of-fact at length for failing to find a reasonable doubt as to his guilt despite what he alleged were numerous weaknesses in the prosecution's case.

In a series of affidavits submitted to the Ohio state courts in post-conviction proceedings, Willis admitted that his sole preparation for Johnson's capital murder trial consisted of reading the transcript of the petitioner's first trial – a trial that had resulted in convictions for aggravated murder and aggravated robbery, as well as a sentence of death – and speaking with Johnson himself. According to Willis, "[b]ecause [he] had the testimony of the witnesses' [sic] from the first trial, [he] did not interview them prior to the second trial." Willis also did not request the assistance of an investigator for the trial because he did not "[feel a] need for any new investigation into Gary Johnson's case." But without the aid of pre-trial investigation that would have permitted effective cross-examination of the state's witnesses, Johnson's original counsel had been unable to persuade the jury that his client should not be executed, and there is little – really nothing at all – in the record to suggest that Willis could have succeeded where the first lawyer had failed. As for the possibility of calling witnesses in Johnson's behalf, an affidavit from Willis described the entirety of his preparation for the all-important sentencing phase as follows:

7) Prior to the mitigation phase of Gary Johnson's second trial, I requested that Gary Johnson give me the name of an individual that could say something good on his behalf.

8) Gary Johnson could think of no one that could say anything good on his behalf.

9) Because Gary Johnson did not feel that there was anyone who could say something good on his behalf, there was no mitigation presented in Gary Johnson's case.

Such inaction on the part of defense counsel in this case amounted to a complete abdication of the attorney's duty to investigate and present evidence in mitigation. The United States Supreme Court, this court, and other courts of appeals have consistently recognized the need for *meaningful* investigation by defense counsel prior to the making a decision not to present mitigation testimony during the penalty phase of a capital trial. After such investigation, strategic choices made by counsel "are virtually unchallengeable." *Strickland*, 466 U.S. at 690. However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 691. "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Thus, the question is "not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence [of the defendant's] background *was itself reasonable*." *Id.* at 523. Moreover, as the Supreme Court has noted, "[N]o decision to forgo the presentation of mitigation evidence is reasonable trial strategy under *Strickland* unless the decision is made after a reasonable investigation into mitigation evidence." *Williams v. Anderson*, 460 F.3d 789, 804 (6th Cir. 2006) (citing *Wiggins*, 539 U.S. at 533-34).

Even so, as explained by the United States Court of Appeals for the Third Circuit:

> [T]he preparation and investigation for the penalty phase are different from the guilt phase. The penalty phase focuses not on absolving the defendant from guilt, but rather on the production of evidence to make a case for life. The purpose of investigation is to find witnesses to help humanize the defendant, given that a jury has found him guilty of a capital offense.

*Marshall v. Hendricks*, 307 F.3d 36, 103 (3d Cir. 2002). Likewise, we have recognized that, under Ohio's death penalty statute, "a capital defendant found guilty of a death specification has to present *some* mitigating evidence in order to avoid the death penalty." *Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir. 1999). Consequently, "when a client faces the prospect of being put to death unless counsel obtains and presents *something* in mitigation, minimal standards require some investigation." *Id.* (emphasis in original).

Significantly, however, "[t]he sole source of mitigating factors cannot properly be that information which defendant may volunteer; counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to their utility." *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000). In determining what degree of investigation is "reasonable," the Supreme Court and this court have long looked to "the standards for capital defense work articulated by the American Bar Association (ABA)." *Wiggins*, 539 U.S. at 524 (citing *Strickland*, 466 U.S. at 688). Pursuant to those standards:

> The lawyer . . . has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing. This cannot effectively be done on the basis of broad general emotional appeals or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself. *Investigation is essential to the fulfillment of these functions.*

1 ABA Standards for Criminal Justice 4-4.1 (1982 Supp.) (emphasis added) (quoted in *Hartman*, 492 F.3d at 373 (Clay, J., concurring in part and dissenting in part).

The failure of capital defense attorneys to abide by these standards has, on numerous occasions, led both the Supreme Court and this court to conclude that the constitutional guarantee of effective assistance of counsel has been breached. Indeed, in *Poindexter v. Mitchell*, 454 F.3d 564, 577-78 (6th Cir. 2006), we catalogued a number of instances in which insufficient investigation by defense counsel necessitated a conclusion that capital defendants did not receive the legal assistance to which they were constitutionally entitled, including:

> *Wiggins*, 539 U.S. at 523-28, 123 S.Ct. 2527 (finding ineffective assistance based on counsel's failure to follow leads that would have lead them to discover evidence of severe privation and abuse as a child from his alcoholic mother, and sexual torment and rape in foster care, as well as diminished mental capacities); *Williams v. Taylor*, 529 U.S. 362, 395, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (finding counsel's performance deficient where counsel failed to investigate or otherwise prepare for mitigation until a week before trial and failed to "conduct an investigation that would have uncovered extensive records graphically describing Williams' [sic] nightmarish childhood"); *Harries v. Bell*, 417 F.3d 631, 638 (6th Cir. 2005) (finding that counsel failed to conduct an adequate investigation where counsel limited their investigation to contacting by telephone the petitioner's mother and brother, sent requests for information to some institutions in which the petitioner had been confined, interviewed only four witnesses – the petitioner, his co-defendant, and two state witnesses, and declined to seek the assistance of a mental health expert or to conduct a thorough investigation into the petitioner's history of mental health or family background); *Hamblin v. Mitchell*, 354 F.3d 482, 488 (6th Cir. 2003) (adopting the 1989 and 2003 standard for attorneys representing death penalty prisoners in 1982 and holding that counsel's failure to adhere to those guidelines constituted ineffective assistance of counsel; finding that had counsel investigated the case, counsel would have found a large body of mitigating evidence including fact that the petitioner grew up in a poor and unstable environment and likely suffered from a mental disability or disorder); *Powell v. Collins*, 332 F.3d 376, 399 (6th Cir. 2003) (holding that trial counsel's failure to construct the defendant's social history through access to background records and interviews with family and friends constituted deficient performance); *Coleman v. Mitchell*, 268 F.3d 417, 452 (6th Cir. 2001) (holding that trial counsel were ineffective for failing

to investigate and present the petitioner's highly traumatic childhood, two head injuries, psychological history showing a borderline retarded range IQ and mixed personality disorder); *Carter v. Bell*, 218 F.3d 581, 597, 599 (6th Cir. 2000) (finding deficient performance because counsel failed to investigate and present at mitigation evidence of the defendant's illegitimacy, family history, limited education, low IQ, mental condition and positive relationships with children); *Austin v. Bell*, 126 F.3d 843, 849 (6th Cir. 1997) (holding that counsel's failure to investigate and present mitigation "because he didn't think it would do any good" rendered death sentence unreliable); *Glenn v. Tate*, 71 F.3d 1204, 1208-11 (6th Cir. 1995) (holding that counsel's investigation was deficient where the attorneys presented some, but failed to uncover more convincing mitigating evidence, including evidence of the petitioner's mental retardation, his neurological impairment, and his need for attention and susceptibility to the influence of his brother).

*See also Haliym v. Mitchell*, 492 F.3d 680, 712 (6th Cir. 2007) (finding ineffective assistance of counsel when counsel failed to investigate evidence of the defendant's abusive and violent childhood, evidence that the defendant suffered intense grief over the loss of his family, and evidence that the defendant suffered from a mental defect).

The performance of the petitioner's counsel at his second trial in this matter is, in many respects, more egregiously deficient than any of the examples listed in our *Poindexter* opinion. The petitioner's counsel at his second trial reviewed the transcript of the first trial, noted the ineffective assistance provided by Johnson's original attorney, and convinced the Ohio state courts that it violated constitutional standards of representation. Nevertheless, prior to and during Johnson's second trial, attorney Willis admittedly interviewed no new or old witnesses, did not request or hire an investigator for the second trial, "felt there was no need for any new investigation into Gary Johnson's case," did not seek any discovery prior to the second trial, and presented no evidence in mitigation at the second trial. Thus, in effect, Willis merely replayed the disastrous initial trial a second time. Not surprisingly, the same result followed, and Johnson was once again sentenced to die at the hands of the state for his crimes.

Willis's justification for the lack of any investigation into his client's background and circumstances, beyond the mere reading of the transcript of the first trial, was that Johnson "could think of no one that could say anything good on his behalf." Obviously,

confining investigation in the defense of a capital case to only the "good" things that could be said about the client cannot be considered a reasonable investigation. In this case, moreover, there were witnesses available to speak in the petitioner's favor. For instance, his daughter, sister, brother, and former mother-in-law all filed affidavits with the state court during post-conviction proceedings stating that they had not been contacted by Willis to testify on his behalf at the mitigation stage of the proceedings. Without their testimony, the jury was left with no alternative but to believe that Johnson's own relatives were not supportive enough of him to plead for his life during the proceedings. Had they testified, however, each of the affiants claimed that they "would have asked the jury to extend [Johnson] mercy and . . . to spare his life" by imposing a life sentence rather than the death penalty. In addition, the petitioner's sister and brother "could have detailed for his sentencing jury, specifics of his childhood, character and life, based upon [their] familiarity with him as a child and [their] first hand-knowledge [sic] of [their] family and home-life." Johnson's former mother-in-law could have further humanized the petitioner in the eyes of the jury by giving "details about the marriage of [her] daughter and Gary Johnson, based upon [her] first-hand knowledge of that marriage."

Without question, the utter lack of meaningful mitigation investigation by Willis in this case compels the conclusion that the representation offered to Johnson by his second trial attorney was deficient and failed to meet minimum standards of competency. Accordingly, because Willis's failure to conduct any investigation was plainly ineffective under the precedents of both this court and the Supreme Court, *see Poindexter*, 454 F. 3d at 577-78, we conclude that the Ohio Court of Appeals applied *Strickland* unreasonably in reaching the opposite conclusion.

Before Johnson can succeed on his claim for habeas relief based upon the ineffective assistance of counsel, however, he must also demonstrate prejudice from that deficient performance. "[I]n order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing." *Hill v. Mitchell*, 400 F.3d 308, 319

(6th Cir. 2005).  Further, because the Ohio Court of Appeals failed to reach the prejudice prong in its analysis, we review this issue *de novo*.  *See Wiggins*, 539 U.S. at 534 ("[O]ur review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis.").

Given the fact that the only evidence placed before the jury by the petitioner during the sentencing phase of the trial was Johnson's own unsworn statement, a statement in which he chastised the jurors for their guilty verdict, almost any other mitigation testimony offered would be considered both stronger and more substantial than what Willis proffered.  In addition to the testimony of numerous family members – individuals whose identity was known to, or easily ascertained by, defense counsel and who could have provided a more compassionate tint to the portrait of the petitioner – even the most basic of investigations would have revealed other important mitigation evidence as well.

For example, Dr. James Eisenberg, a licensed psychologist, stated by affidavit in the post-conviction proceedings in state court that normal investigation and psychological evaluation would have revealed many facts about the petitioner that could have been presented to the jury.  In his examinations and investigations, Eisenberg found, for instance, that Johnson's father frequently beat the petitioner as a child with an iron cord or coffee pot cord until Johnson would bleed.  On one occasion, the father even threatened then-young Johnson "with a German Luger stating, 'I should have killed you when you were a baby.'"  Johnson was further exposed to violence both in elementary school where he often engaged in fights, and in his predominately white neighborhood where the African-American petitioner was forced to defend himself in numerous skirmishes.

Additional items of potential mitigation discovered by Eisenberg included the following findings:

> As an adult Gary's interests remained adolescent and unrealistic. . . . He used various drugs including cocaine.  Though he denies an underlying drug problem, some of his friends believed that he was indeed a frequent user of rock cocaine.

* * * * *

He has some difficulty . . . with inductive reasoning. He is likely to take things literally and respond directly to a crisis. Mr. Johnson shows low scores on several performance subtests. The results indicate inadequate visual organization and the inability to perceive the "whole in relation to the parts."

* * * * *

Individuals with similar [Minnesota Multiphasic Personality Inventory - 2] profiles experience repeated failures in interpersonal relationships. Although dependent and having strong needs for affection, they are anxious much of the time, feel easily threatened, and are overly suspicious of others. They have difficulty expressing emotions in a modulated fashion. . . . Individuals with [a profile like Johnson's] are usually unable to express emotions in an adapted, modulated way and they may alternate between overcontrol and direct, undercontrolled emotional outbursts.

* * * * *

His responses [on the Rorschach Inkblot Test] suggest that he is somewhat impulsive, oppositional, and has failed to internalize adult values. Mr. Johnson's profile is much more typical of adolescents than adults with numerous animal but few human responses.

* * * * *

[T]hough he is intellectually competent, he is quite adolescent and impulsive in his behavior with a lack of the ability to correctly organize and synthesize information. His emotional development has not matched his intellectual development. He has a grandiose response to the world in which he reacts to rather than thinks through crises.

* * * * *

Gary Johnson meets the criteria for cocaine abuse and for a mixed personality disorder. . . . The diagnosis of cocaine abuse is based on the reported use by the defendant and on corroborated statements by other witnesses, notably Edward Williams. The facts of the crime are consistent with what is known about how cocaine affects mood, thinking, and behavior. High-dose abuse can result in extreme agitation, explosiveness, and paranoid ideation.

Gary Johnson's mixed personality disorder with histrionic, antisocial, and paranoid features is directly related to his home life and early childhood development. The features of the histrionic disorder include dramatic and intense behavior, problematic interpersonal relationships,

and attention-seeking. Histrionic individuals usually develop new relationships with relative ease and they appear to be socially able. However, these relationships generally turn out to be shallow without substance. The main defenses of a histrionic are denial and projection of blame unto others. Gary's antisocial features stem from an early introduction into criminal activity both within and outside the home. The family business encouraged prostitution, gambling, and pimping. Gary's paranoid features stem from his home environment both in and around Hough and in a predominantly white neighborhood in which he had to always be on guard. When combined together, the histrionic, antisocial, and paranoid features result in an individual who is [sic] likes to be the center of attention, but is suspicious of those who are drawn to him; is in need of immediate gratification but trusts no one to meet those needs; attempts to develop interpersonal relationships, but has little understanding of adult, in-depth feelings. When these features are combined with drugs, specifically cocaine, then the need for immediate gratification becomes overwhelming as does the paranoid mistrust. In summary, Gary Johnson's basic personality style is very much adolescent in quality. He has failed to develop adult values and appears to be fixated in a stage of development usually associated with impulsiveness and antisocial conduct. The use of drugs, notably cocaine, also maintains a high need for immediate gratification. Gary has never internalized an appropriate adult value system. This is directly due to the environment in which he was raised in which his dominant role models were engaged in illegal activities. Gary learned well from these role models and saw himself as successful in various illicit activities including prostitution and drug use.

Each of these items of information about Johnson and his social and emotional development "differ[ed] in a substantial way . . . from the evidence actually presented at sentencing." *Id.* When combined, moreover, a drastically different portrait of the petitioner emerges. At trial, counsel's failure to investigate left Johnson with only his own unsworn, antagonistic statement to the jury to counteract the evidence of aggravating circumstances attendant to the crime. As a result, the jurors were left with no choice but to view Johnson as a calculating individual, apparently a loner without human connection even with his family, and willing to murder anyone standing in the way of his acquisition of money that could be used to purchase drugs or alcohol. The presence of other information easily uncovered by the investigation of an effective advocate, however, would have allowed the jurors to see that the petitioner's relatives did care about Johnson, that as a child he had endured many hardships and traumatic

experiences, and that he suffered from a personality disorder that, although not absolving him of responsibility for his crimes, helped explain why certain circumstances would be viewed by the petitioner in certain ways and would prompt certain abnormal responses. The jury might also have seen Johnson as an individual struggling to act appropriately in the face of paranoia and a distorted world view, a struggle that was only exacerbated by drug abuse. To hold in this case that serious consideration of such evidence could not have "change[d] the calculation the jury previously made when weighing the aggravating and mitigating circumstances of the murder," *Hill*, 400 F.3d at 319, is – in our judgment – to ignore reality.

Johnson also contends that Willis provided ineffective assistance of counsel by failing to deliver an adequate closing argument during the sentencing phase of the second trial. We find no merit to this claim for the simple reason that the petitioner cannot establish that he was prejudiced by that argument, even if the closing was not as stirring or as eloquent as it could have been. As we have noted, "In the context of a death sentence, the question of prejudice turns on 'whether there is a reasonable probability that, absent the errors, the sentencer . . .  would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Id.*, 400 F.3d at 314 (quoting *Strickland*, 466 U.S. at 695). Given the grossly inadequate presentence investigation performed by Willis, and the complete absence of mitigation evidence put before the jury, there is little more that counsel could have done in terms of arguing the petitioner's case to the jury.

**7.** *Motion to Recuse*

In a final issue certified for appeal, the petitioner contends that Judge Nugent, the district judge who ruled on his habeas petition, should have recused himself, an action required under 28 U.S.C. § 455(a) "if a reasonable, objective person, knowing all of the circumstances, would have questioned the judge's impartiality." *Hughes v. United States*, 899 F.3d 1495, 1501 (6th Cir. 1990). We review the denial of a motion to recuse for abuse of discretion. *See Bell v. Johnson*, 404 F.3d 997, 1004 (6th Cir. 2005).

In the district court, Johnson based his allegations of bias on Judge Nugent's past connections with others involved in the litigation of his case in state court. Specifically, he argued that a reasonable person would have questioned the judge's impartiality because Judge Nugent was, during the time of Johnson's first trial, a colleague of the lead prosecutor, who also participated in Johnson's second trial; Judge Nugent was, during the time of that second trial, a colleague of the two state-court trial judges who presided over Johnson's first and second trials, respectively; Judge Nugent was, during the time of Johnson's post-conviction litigation in state court, a colleague of the appeals judges who reviewed his petitions; and Judge Nugent prosecuted Donald Williams, a potential witness in this case. However, unlike the judges in out-of-circuit cases cited by Johnson, *see Russell v. Lane*, 890 F.2d 947, 948 (7th Cir. 1989); *Rice v. McKenzie*, 581 F.2d 1114, 1117 (4th Cir. 1978), Judge Nugent did not play any part in Johnson's prosecution or the adjudication of his state trials, appeals, or petitions for post-conviction relief.

Moreover, we have consistently held that a judge need not recuse himself on the basis of prior contact with a party or a witness, as long as the judge does not have a familial, financial, or similarly close relationship with the party or witness and as long as the judge has not received out-of-court information about the case at hand. *See, e.g.*, *United States v. Dandy*, 998 F.2d 1344, 1349-50 (6th Cir. 1993); *United States v. Sammons*, 918 F.2d 592, 598-99 (6th Cir. 1990). Because Johnson has not alleged that Judge Nugent had any such direct contact with Johnson's cases or received extrajudicial information about them as a result of his prior connections, we conclude that the district court did not commit an abuse of discretion in denying the petitioner's motion to recuse.

### III. *CONCLUSION*

Although most of the issues certified for review on appeal do not entitle the petitioner to habeas relief, Johnson has established that the state courts unreasonably applied well-established law in concluding that the petitioner's attorney at his second trial afforded him constitutionally effective assistance of counsel during the penalty phase of the proceedings. We therefore AFFIRM the denial of habeas relief regarding

the state court's judgment of conviction, but REVERSE the judgment of the district court relating to the petitioner's sentence and REMAND this matter for issuance of a conditional writ of habeas corpus vacating Johnson's death sentence, unless the State of Ohio conducts a new sentencing hearing within 180 days of remand.