**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0135n.06

**No. 09-1199**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

OMAR WARLICK,

        Petitioner-Appellant,

v.

KENNETH ROMANOWSKI, Warden

        Respondent-Appellee.

_____/

**FILED**
**Mar 03, 2010**
LEONARD GREEN, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

BEFORE: SUHRHEINRICH, SUTTON, and COOK, Circuit Judges.

**SUHRHEINRICH, Circuit Judge.** Omar Warlick ("Warlick") is a Michigan inmate convicted of felony-murder and sentenced to life in prison. We **AFFIRM** the district court's denial of his petition for writ of habeas corpus.

## I. Background

This petition arises out of the murder of Bryan Fortune ("Fortune"), the owner of the Beehive Lounge in Detroit. He was killed during a robbery or attempted robbery just before 6:00 a.m. on September 4, 2002, in his apartment that sits above the Beehive Lounge. According to the testimony of Erin Walker ("Walker"), Fortune's girlfriend, two men entered the apartment through a door that leads to the roof. She saw that one man had a gun, but she could not tell if the second one was armed. When the men entered, she ran out the front door of the apartment. Upon leaving, she heard two gunshots and called 911 from a gas station across the street. The police arrived shortly thereafter and found Warlick hiding in the Beehive Lounge's DJ booth about twenty feet from the murder

weapon—a nine-millimeter gun. The police placed Warlick under arrest at approximately 6:30 a.m. Witnesses saw a second man, who was never caught, exit the building and flee the scene.

At 8:50 a.m., Warlick began speaking with Officer Anthony Jackson ("Officer Jackson"). At 10:00 a.m., after speaking with Officer Jackson for over an hour, Warlick agreed to provide a signed statement recounting his version of the events that morning. The police performed a gunshot residue test on Warlick at some point during this conversation.

According to his statement, Warlick did not shoot Fortune. A man named Spoon shot Fortune with a nine-millimeter owned by Spoon. Spoon drove a 2000 red Cherokee Sport. Spoon picked Warlick up early that morning around 12:30 a.m. or 1:00 a.m. Spoon said to him, "that old girl put him on a lick," and that they needed to get a ladder so they could climb on a roof. Spoon left to get a ladder, and once he returned, they went to the Beehive Lounge, where they waited and watched as people left. After a few people had departed, they leaned the ladder against the building and climbed onto the roof. Once on the roof, they looked inside the apartment and observed the owner of the bar and a girl arguing. The girl looked out the door, saw Warlick, and ran. At that point Spoon walked into the apartment and Warlick followed in after him. Spoon told the man to get to the floor, the man "came at" them, and Spoon shot him. They then began looking for the safe, eventually going into the bar portion of the Beehive Lounge. There, Warlick grabbed the cash register, and Spoon kept looking for the safe. Eventually, they noticed that the police had arrived. They ran to the back of the bar to flee but could not exit the building. Warlick then hid in the DJ booth, and Spoon ran out the front door. Warlick did not know what Spoon did with the gun or who the girl was who set up the lick. He speculated that it was the girl in the room with Fortune. He stated that the plan was "to go in there, hit the club, get the money and get out. The girl left all of

2

the doors open." He did not know that Spoon had a gun, and he never would have participated in the robbery if he had known Spoon would shoot someone.

The State charged Warlick with first-degree felony murder. The alternative theories of the State's case were that Warlick either shot Fortune or aided and abetted the shooter. The trial court held an evidentiary hearing prior to trial, where Warlick and Officer Jackson testified, to consider whether to suppress Warlick's statement. The judge held that the statement was admissible.

At trial, the State's witnesses included Walker and multiple police officers who were involved in the investigation. Warlick's statement was entered into evidence, as were the results of the gunshot residue tests administered on Warlick and Walker. Residue was found on Warlick's forehead, face, hands, and clothing. Expert testimony was presented that the residue indicated that Warlick either shot Fortune or was in very close proximity to the gun when it was fired.

The only defense witness was Officer Michael Carter. He testified that he examined a red Jeep Cherokee, found some latent fingerprints and a live nine-millimeter bullet in the console between the two front seats, and took photographs of the vehicle. The officer did not know who owned the vehicle or whether the fingerprints were traceable. Warlick did not testify. The statements of two res gestae witnesses were entered into the record by stipulation: both witnesses said they heard two gun shots. One of the two witnesses said he saw someone flee in "a red truck, Jeep, Jimmy or something."

The jury convicted Warlick of first-degree felony murder, and he was sentenced to life in prison. The Michigan Court of Appeals upheld his conviction on direct appeal, *People v. Warlick*, No. 247213, 2004 WL 1699012 (Mich. Ct. App. Jul. 29, 2004), and the Michigan Supreme Court declined to review the decision. *People v. Warlick*, 693 N.W.2d 821 (Mich. 2005) (table).

3

Warlick then filed this nine-claim habeas petition before the Eastern District of Michigan pursuant to 28 U.S.C. § 2254. The district court dismissed three of Warlick's claims for failure to exhaust state appeals. The claims dismissed were improper (1) jury instruction, (2) endorsement of a State witness, and (3) admission of a 911 tape. The district court later denied his six other claims after the case was transferred to a new judge. *Warlick v. Romanowski*, No. 06-10252, 2009 WL 92227 (E.D. Mich. Jan. 14, 2009). Warlick appeals. He alleges (1) insufficiency of convicting evidence, (2) improper admission of his statement to police, (3) improper withholding of evidence, (4) prosecutorial misconduct and ineffective assistance of counsel, (5) deprivation of his right to testify and ineffective assistance of counsel, and (6) erroneous dismissal of three claims for failure to exhaust available state appeals.

## II. Analysis

### A. Standard of Review

Warlick's petition is subject to review under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). He is entitled to the writ of habeas corpus if the state court's adjudication of his claim on the merits either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The decision of a state court is contrary to clearly established federal law when the state court reaches an opposite conclusion than the one decided by the Supreme Court on a question of law, or when the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court

4

has made an unreasonable determination of the facts when it identifies the correct governing principle from the Court's decisions but unreasonably applies the principle to the facts of the case. *Id.* at 407-08. In an appeal of a federal habeas proceeding, this court reviews the district court's legal conclusions de novo and its factual findings for clear error. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999).

## B. Sufficiency of Convicting Evidence

Warlick argues that the State presented insufficient evidence at trial to sustain a conviction, in violation of *Jackson v. Virginia*, 443 U.S. 307 (1979). Under the *Jackson* standard, a due process violation has occurred "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324. To determine whether Warlick merits habeas relief, this court must employ deference at two different levels: "First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (citing *Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007)).

This court must analyze Warlick's claim with explicit reference to the substantive elements of the criminal offense. *Jackson*, 443 U.S. at 324 n.16. The elements of felony murder in Michigan are:

> (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in [the statute, including armed robbery].

*People v. Carines*, 597 N.W.2d 130, 136 (Mich. 1999) (quoting *People v. Turner*, 540 N.W.2d 728,

5

732 (Mich. Ct. App. 1995)).

Warlick's argument fails because the State presented sufficient evidence to support the jury's verdict under either theory of the case, and the Michigan Court of Appeals' consideration of this issue reasonably applied the principles found in *Jackson*. First, the jury could have believed that Warlick shot Fortune, which would indicate that he had an intent to kill. The evidence presented at trial supported this theory: Warlick admitted that he participated in the robbery, the police found him hiding close to the murder weapon, and the gunshot residue test revealed residue on his hand, face, and clothes.

Second, the jury could have inferred that Warlick possessed malice under the aiding and abetting theory. The facts and circumstances of a killing can give rise to an inference of malice. *Id.* In *Carines*, a felony murder case, the Michigan Supreme Court held that a jury can infer that a defendant acted with malice, even if the defendant did not personally use the murder weapon, if the "defendant set in motion a force likely to cause death or great bodily harm." *Id.* As an admitted participant in the planning and execution of the robbery, the jury could have reasonably inferred that Warlick knew Spoon would be armed. At a minimum, the jury could have deduced that Warlick saw a gun in his partner's hands right before they entered the apartment since Walker testified that a gun was drawn when they entered.

## C. The Admissibility of Warlick's Confession

Warlick argues that his statement was a product of coercion. For his statement to have been admissible, Warlick had to "voluntarily, knowingly and intelligently" waive his right to remain silent. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). To make this determination, this court must look at the totality of the circumstances to ascertain whether Warlick made an uncoerced choice and

whether he possessed the required level of comprehension. *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). Factors to consider in this analysis include "the age, education and intelligence of the suspect; whether the suspect was advised of his *Miranda* rights; the length of the questioning; and the use of physical punishment or the deprivation of food, sleep or other creature comforts." *Jackson v. McKee*, 525 F.3d 430, 433-34 (6th Cir. 2008) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

The Michigan courts reasonably determined that Warlick's statement was not a product of coercion. At the suppression hearing on this issue, Officer Jackson and Warlick testified about the events that led to the statement. Warlick testified that he was promised that the police would mention his help to the prosecutor if he cooperated. Officer Jackson testified that no threats, coercion, or promises were made to gain Warlick's cooperation. Based on this testimony and the judge's own observations, the judge decided that the statement was admissible. The judge noted that Officer Jackson thoroughly instructed Warlick of his rights, Warlick's demeanor and educational level made it appear that he was knowledgeable about his rights, and Warlick gave his statement freely, voluntarily, and knowingly. The Michigan Court of Appeals deferred to the trial judge's credibility determination and employed a reasonable analysis under *Miranda* and its progeny to support the admittance of Warlick's statement.

### D. Suppression of Evidence

Warlick argues that the State suppressed evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). To prevail on his *Brady* claim, Warlick must demonstrate that (1) the evidence in question is favorable, (2) the State suppressed the relevant evidence, and (3) the State's actions resulted in prejudice. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). To support his *Brady* claim,

7

Warlick contends that a delay in turning over material encompassed by a discovery order inhibited his counsel's ability to provide an effective defense. While it is true that a discovery order for supplemental discovery was granted on November 4, 2002, and that the State did not fully comply with the terms of the order, Warlick's claim fails to the extent that he suggests that the violation of the discovery order itself supports his *Brady* claim. *See Colston v. Burke*, 37 F. App'x 122, 125 (6th Cir. 2002) (holding that a violation of a state discovery order is not a cognizable habeas claim). Warlick does not articulate which pieces of evidence within the discovery order support his *Brady* claim. Even assuming that it would be some or all of the evidence encompassed by the discovery order, Warlick's claim still fails because the Michigan Court of Appeals reasonably applied *Brady* to hold that Warlick had not established that any of the evidence in question was favorable to his case.

Additionally, the Michigan Court of Appeals reasonably determined that Warlick had failed to establish that he was prejudiced by the failure to turn over evidence, as required by *Brady*. None of the evidence encompassed by the discovery order, even when considered collectively, suggests that the proceedings would have been different if the evidence had been disclosed earlier. *See Johnson v. Bell*, 525 F.3d 466, 475 (6th Cir. 2008) (noting the Supreme Court's requirement to consider evidence collectively, and not item by item, to determine whether a *Brady* violation occurred). Specifically, the record indicates that the trial judge was sensitive to many of the issues raised by the State's failure to fully comply with the discovery order and made accommodations to avoid any prejudice to Warlick's defense.

### E. Prosecutorial Misconduct

Warlick argues that the State engaged in prosecutorial misconduct at several points during

his trial. The Michigan Court of Appeals reviewed this argument under the plain error standard, and its determination is subject to AEDPA deference. *Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009). To sustain a prosecutorial misconduct violation under AEDPA, Warlick must first demonstrate that the prosecutor's remarks were improper. *Johnson v. Mitchell*, 585 F.3d 923, 936 (6th Cir. 2009). Specifically, Warlick "must show that any prosecutorial misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Henley v. Bell*, 487 F.3d 379, 389 (6th Cir. 2007) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). If this court determines that the remarks were improper, then a four-factor test is applied to ascertain whether the statements in question were flagrant, and thus in violation of the defendant's due process rights. *Johnson*, 585 F.3d at 936. To meet this high burden, Warlick argues that 1) the prosecutor appealed to the civic duty of the jurors, 2) the prosecutor shifted the burden of proof to the defendant, 3) the prosecutor's cumulative conduct denied Warlick of his due process rights.

Warlick's argument is procedurally defaulted because his counsel did not object to the prosecutor's conduct at trial. Three elements must be satisfied for a procedural default to exist:

> 1) the petitioner failed to comply with a state procedural rule that is applicable to the petitioner's claim; (2) the state courts actually enforced the procedural rule in the petitioner's case; and (3) the procedural forfeiture is an "adequate and independent" state ground foreclosing review of a federal constitutional claim.

*Willis v. Smith*, 351 F.3d 741, 744 (6th Cir. 2003) (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)). All three elements are met in this case. First, Michigan has a state procedural rule that generally requires defendants to preserve all constitutional and nonconstitutional claims by first raising them at trial. *People v. Grant*, 520 N.W.2d 123, 128 (Mich. 1994). Second, the Michigan Court of Appeals, the last reasoned opinion of the state courts, enforced this rule in its decision. *See*

9

*Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)) ("In determining whether state courts have relied on a procedural rule to bar review of a claim, we look to the last reasoned opinion of the state courts and presume that later courts enforced the bar instead of rejecting the defaulted claim on its merits."). Third, the procedural rule was an adequate and independent state ground which foreclosed review because it was "firmly established and regularly followed by the time as of which it [was] to be applied." *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)). *See generally Strickland v. Pitcher*, 162 F. App'x 511, 520 (6th Cir. 2006) (holding that a prosecutorial misconduct claim was procedurally defaulted where the defendant's counsel failed to object when the prosecutor made the statements).

This court can only excuse the procedural default if Warlick can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). To establish cause for the default, Warlick submits that his trial counsel provided him with ineffective assistance of counsel. Ineffective assistance of counsel that surpasses the constitutional threshold may be cause for a procedural default, but attorney error that falls short of this high standard is not cause. *McCleskey v. Zant*, 499 U.S. 467, 494 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 486-88 (1986)). Accordingly, this court must consider the constitutional standard for ineffectiveness of counsel to make its determination. An ineffective assistance of counsel claim by a habeas petitioner is a mixed question of law and fact considered de novo on appeal from the district court. *Lucas*, 179 F.3d at 416. To prove constitutionally ineffective assistance of counsel, Warlick must show that 1) his counsel's performance was deficient, and 2)

10

the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Warlick has failed to establish that the Michigan Court of Appeals unreasonably held that his counsel was not defective in any of the circumstances he raises. Warlick's civic duty argument fails because the prosecutor never made such an argument in his closing statement. Likewise, the prosecutor did not make any statements that shifted the burden of proof. Perhaps in acknowledgment of these deficiencies, Warlick argues that the cumulative misconduct of the prosecutor also forms the basis for his due process claim. There is some disagreement in this court as to whether a defendant, post-AEDPA, can cumulate constitutional errors. *Compare Alexander v. Smith*, 311 F. App'x 875, 891 (6th Cir. 2009) (per curiam) ("[E]ven when no one error may in itself be reversible, the totality of the error can deny a defendant his right to due process."), *with Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) ("But we have held that, post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief."). To support his cumulation argument, Warlick refers to case law on other established types of prosecutorial misconduct—in addition to the civic duty and burden of proof claims arguments already discussed—but he does not argue that the prosecutor engaged in any of the misconduct discussed in those cases. As a result, the resolution of whether a cumulative claim can be made post-AEDPA is inconsequential because "[m]any of [Warlick's] claims appear to be novel, frivolous, or unpersuasive. Cumulating them therefore does not alter the analysis." *Alexander*, 311 F. App'x at 891. Given the frivolity of Warlick's claims, defense counsel could not have erred in not objecting to the prosecutor's conduct.

This court does not need to consider the prejudice prong of the *Strickland* test because

11

Warlick has failed to identify any misconduct by his attorney. *Strickland v. Washington*, 466 U.S. at 687. In view of Warlick's inability to demonstrate that his counsel rendered constitutionally defective assistance, his prosecutorial misconduct claim fails unless he can prove that he has experienced a miscarriage of justice. Only in exceptional circumstances will a miscarriage of justice exist when the cause and prejudice requirements have not been met. *Murray*, 477 U.S. at 496. In this exceptional scenario, a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* Warlick has produced no evidence that suggests that he is actually innocent of the crime. On the contrary, he has admitted that he participated in the robbery, and ample evidence was presented at trial that he either shot the victim or aided and abetted the shooter. Therefore, his prosecutorial misconduct claims fail.

### F. Right to Testify

Warlick argues that his trial counsel deprived him of his constitutional right to testify. *See Rock v. Arkansas*, 483 U.S. 44, 51-52 (1987). Only a defendant can knowingly and voluntarily relinquish his right to testify; counsel's role in this decision must be advisory. *United States v. Webber*, 208 F.3d 545, 550 (6th Cir. 2000). It is presumed that Warlick waived his right to testify unless the record states otherwise. *Id.* at 551 (citing *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993)). Furthermore, this court has expressly declined to require that a waiver of the right to testify be made on the record. *Id.* If a defendant wishes to testify against his counsel's wishes, he can insist on testifying, communicate the desire to testify to the trial court, or discharge his counsel. *Id.* (citing *Joelson*, 7 F.3d at 177). Warlick did none of these actions. The record is silent on this issue; consequently, Warlick has failed to rebut the presumption that he knowingly and voluntarily waived his right to testify.

12

Warlick blames the ineffective assistance of his trial counsel for the failure to raise this issue on the record. He claims that his counsel recommended not testifying, warning him that if he did testify, he would be impeached with his 1993 conviction for carrying a concealed weapon. Warlick, however, has not established that his counsel was constitutionally ineffective. Warlick's counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. In addition, it is presumed that the defendant assented to the decision not to testify when the decision was tactical. *Webber*, 208 F.3d at 551. Here, according to Warlick, the decision to not testify was tactical because Warlick's counsel was concerned about impeachment with the prior conviction. In light of these strong presumptions in favor of Warlick's counsel, rebutted only by Warlick's present allegations, his claim fails because the Michigan Court of Appeals reasonably determined that his counsel was not ineffective in not obtaining an express waiver of his right to testify. *See Hodge v. Haeberlin*, 579 F.3d 627, 639 (6th Cir. 2009) ("[The defendant's] present allegations that he wanted to testify and was prevented from doing so do not suffice to overcome the presumption that he assented to the tactical decision that he not testify.").

Moreover, even if it is assumed that Warlick's counsel did not permit him to make the decision not to testify, Warlick has failed to satisfy the prejudice prong of the *Strickland* test. *See Strickland*, 466 U.S. at 687. Nowhere in Warlick's argument does he suggest how this decision prejudiced him at trial. *See* Hodge, 579 F.3d at 640. Particularly, he does articulate what his testimony would have consisted of or how his testimony would have impacted the jury's verdict.

13

Next we turn to the three claims that the district court held to be unexhausted.[1]

### G. Improper Jury Instruction

Warlick argues that the district court improperly dismissed his first habeas claim—alleging a due process violation with regard to the jury instruction on the intent requirement for felony murder—for failure to exhaust state court remedies. A prisoner must exhaust available state remedies to give the state the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam)). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* (quoting *Duncan*, 513 U.S. at 365-66).

Warlick argues that he appropriately raised this claim for the first time before the Michigan Supreme Court because he could not bring a new claim to the Michigan Court of Appeals after it had rendered its decision. However, a defendant has failed to "fairly present" an issue when it is raised for the first time when review is discretionary. *Castille v. Peoples*, 489 U.S. 346, 351 (1989). Specifically, this court has found that an issue has not been fairly presented when it is raised for the first time to the Michigan Supreme Court, and that court declines to exercise its right to discretionary review. *See, e.g., Farley v. Lafler*, 193 F. App'x 543, 549 (6th Cir. 2006).

### H. Late Endorsement of a State Witness

Warlick argues that his due process rights were violated by the trial court's late endorsement

---

[1] Because we dispose of these three claims on other grounds, we do not consider the State's waiver argument.

14

of State witness Don Dent ("Dent")—the evidence technician that conducted the gunshot residue test on Warlick. Because the Michigan Court of Appeals only considered the merits of this claim on state law grounds, this court considers this issue de novo. *Danner v. Motley*, 448 F.3d 372, 376 (6th Cir. 2006). Dent was left off of the State's original witness list—apparently inadvertently—but the judge nevertheless allowed him to testify at trial. Warlick contends that this decision violated his federal due process rights.

The district court refused to consider this claim because it believed that Warlick had failed to put the Michigan courts on notice that a federal due process claim was being raised. Even if the district court erred in dismissing Warlick's claim as unexhausted, his claim still fails on the merits. A decision regarding the endorsement of a witness generally constitutes a state law matter within the trial court's discretion, and Warlick has not presented a legitimate reason for disturbing the trial judge's ruling, which has already been deemed proper under Michigan state law. *See Warlick*, 2004 WL 1699012, at *3 (Mich. Ct. App. Jul. 29, 2004); *see also Daniels v. Romanowski*, No. 07-CV-10462, 2009 WL 236543, at *4 (E.D. Mich. Jan. 29, 2009). It is well-settled that there is no general constitutional right to discovery in a criminal case. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). Thus, for an evidentiary ruling to violate due process and warrant habeas relief, it must be "so egregious that it results in a denial of fundamental fairness." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) (citing *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001), *and Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000)).

The trial court's endorsement of Dent falls far below this high threshold, especially because Warlick should have reasonably anticipated that someone would present testimony about administering the gunshot residue test. Additionally, Warlick was not prejudiced by the decision to

15

allow Dent to testify because he had ample opportunity to cross-examine Dent and explain his testimony. *See Mayes v. Gibson*, 210 F.3d 1284, 1292 (10th Cir. 2000) (holding that the late endorsement of a prosecution witness did not prejudice the defendant because defense counsel conducted an adequate cross-examination and had a meaningful opportunity to explain the evidence offered).

## I. Improper Authentication of the 911 Call

Warlick claims that his federal due process rights were violated by the trial judge's decision to admit Walker's 911 call to the police. Because the Michigan Court of Appeals only considered the merits of this claim on state law grounds, this court considers this issue de novo. *Danner*, 448 F.3d at 376. Warlick argues that this phone call was not sufficiently authenticated, despite Walker's testimony that identified the tape as a recording of her phone call to 911. Again, even if the district court erred in dismissing Warlick's claim as unexhausted—as determined by the district court—his claim still fails on the merits. The authentication of the 911 tape did not threaten the fundamental fairness of Warlick's trial, especially since Walker authenticated the tape and the contents of the 911 call were not instrumental to Warlick's conviction. *See Bugh*, 329 F.3d at 512.

## III. Conclusion

For the foregoing reasons, we **AFFIRM**.