RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0269p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

                                   *Plaintiff-Appellee,*

    *v.*

ROBERT PRINCE, III,

                                  *Defendant-Appellant.*

No. 08-6547

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 04-20223-004—Jon Phipps McCalla, Chief District Judge.

Argued: August 5, 2010

Decided and Filed: August 26, 2010

Before: GUY and GRIFFIN, Circuit Judges; WILHOIT, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Cheryl B. Wattley, LAW OFFICES OF CHERYL B. WATTLEY, Norman, Oklahoma, for Appellant. Kevin P. Whitmore, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee. **ON BRIEF:** Cheryl B. Wattley, LAW OFFICES OF CHERYL B. WATTLEY, Norman, Oklahoma, for Appellant. Kevin P. Whitmore, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee.

_____

**OPINION**

_____

RALPH B. GUY, JR., Circuit Judge. Defendant Robert Prince, III, was convicted following a jury trial of one count of conspiracy to commit money laundering

_____

[*] The Honorable Henry R. Wilhoit, Jr., Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

in violation of 18 U.S.C. § 1956(h), and multiple counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and § 2, in connection with fraudulent claims for payment for physical therapy services provided to Medicare beneficiaries. Challenging the sufficiency of the evidence to support his convictions, defendant appeals from the denial of his consolidated motion for judgment of acquittal or new trial. Defendant also claims "fundamental error" resulting from the appearance of partiality toward a witness whose attorney also represented the district judge in a prior proceeding. Finally, defendant argues that the district court erred in denying his pretrial motion for disclosure of the government's exhibit list. After review of the record, we affirm.

## I.

Defendant Robert Prince, III (Defendant), along with his brother Michael Prince (Prince), sister Marilyn Prince Watts, M.D. (Watts), and uncle Darryl Dempsey (Dempsey), were charged with various fraud and money laundering offenses arising out of the operation of two physical medicine companies located in Memphis, Tennessee. Although there was considerable evidence relating to other physical medicine companies that operated in largely the same manner, the charges related specifically to Medicare payments received by Brittsen Rehabilitation, Inc. (Brittsen), and Tender Loving Rehabilitation, Inc. (TLR), for in-home physical therapy services performed by unlicensed physical therapy technicians without the direct over-the-shoulder physician supervision that was required for reimbursement under Medicare Part B. The indictment alleged that Brittsen received $2.9 million and TLR received $600,000 in payments from Medicare on fraudulent claims for physical therapy services.

Not named in all of the counts, defendant was charged with conspiracy to commit wire and health care fraud (count 1), multiple substantive counts of health care fraud (counts 2-11), conspiracy to commit money laundering involving the proceeds of the health care fraud (count 14), multiple substantive counts of money laundering (counts 15-54), and criminal forfeiture (count 63). Defendant was not included in the charges alleging the payment of kickbacks for the procurement of patients at Brittsen (counts 12-13), or money laundering transactions involving amounts greater than $10,000 (counts

55-62). Defendant rejected the government's "global" plea offer, which was contingent on acceptance by all of the defendants. Defendant proceeded to trial, while the other defendants entered separate plea agreements.

On June 26, 2008, following ten days of testimony and two days of deliberations, the jury acquitted defendant of the fraud charges but found defendant guilty of conspiracy to commit money laundering, 38 counts of money laundering, and criminal forfeiture (counts 14, 15-54, and 63). Defendant moved for judgment of acquittal or a new trial pursuant to Fed. R. Crim. P. 29 and 33(a), challenging, in part, the weight and sufficiency of the evidence. The district court denied that motion in a written order entered November 7, 2008. Defendant was sentenced to concurrent 63-month terms of imprisonment, and was ordered to pay restitution in the amount of $420,000. This timely appeal followed.

## II.

This court reviews *de novo* the denial of a motion for acquittal challenging the sufficiency of the evidence. *United States v. Mabry*, 518 F.3d 442, 447-48 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 1523 (2009). The relevant question on direct appeal is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In making this determination, "we do not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury." *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994).

To establish a money laundering conspiracy, the government must prove (1) that two or more persons conspired to commit the crime of money laundering, and (2) that the defendant knowingly and voluntarily joined the conspiracy. *See Whitfield v. United States*, 543 U.S. 209, 212 (2005) (holding that § 1956(h) conspiracy does not require proof of an overt act). The indictment alleged a conspiracy to commit money laundering: to promote a specified unlawful activity, namely, health care fraud, § 1956(a)(1)(A)(i); to conceal the origin of the funds, § 1956(a)(1)(A)(ii); or in a

transaction of a value greater than $10,000, § 1957.  The substantive counts alleged only promotional money laundering, and aiding and abetting promotional money laundering, in violation of § 1956(a)(1)(A)(i), which requires proof that the defendant: "'(1) conducted a financial transaction that involved the proceeds of unlawful activity; (2) knew the property involved was proceeds of unlawful activity; and (3) intended to promote that unlawful activity.'"  *United States v. King*, 169 F.3d 1035, 1039 (6th Cir. 1999) (citation omitted).

Defendant does not dispute that there was sufficient evidence to establish that health care fraud was in fact occurring at Brittsen and TLR, or that the financial transactions at issue actually involved the proceeds of that fraud.  Rather, defendant maintains that the evidence was not sufficient to establish that he *knew* that health care fraud was being committed or, therefore, that he knowingly joined in the money laundering conspiracy or engaged in the specific financial transactions knowing that they involved proceeds of the fraud.  We disagree.  Without recounting all the testimony, we summarize the evidence from which defendant's knowledge could be inferred.

**A.     Evidence**

Brittsen and TLR, which opened in 1999 and 2001, respectively, were two of a series of physical medicine businesses started by Michael Prince and a varying constellation of family and other associates.  Brittsen and TLR were the only two located in Tennessee, and the only two in which Dr. Watts participated.  The defendant was involved in managing the finances and doing bookkeeping for many of the physical therapy businesses, as well as for the billing and consulting companies that received payment from those businesses.

Michael Prince was not a doctor, although he and his sister, Dr. Watts, attended medical school together at the University of Texas and participated in the same graduation ceremony in 1996.  Watts received her degree and Prince was allowed to "walk" in the ceremony, but the program noted by way of asterisk that Prince's degree was "pending" with an expected completion date of November 1996.  Prince never completed the degree requirements because he repeatedly failed the boards.  Watts

testified that she knew Prince was not a doctor. Both she and Prince admitted that they misled others into believing that he was a doctor by referencing their time together in medical school, or by not correcting those who assumed that he was a doctor.

Defendant, who did not testify at trial, emphasizes that there was no evidence that anyone specifically told him that his brother was *not* a doctor. There was evidence, however, that defendant was at the graduation ceremony in 1996. In addition, Prince testified that he never told his family that he had completed his degree. Nor was there any evidence that the defendant was affirmatively misled on this score. Moreover, as a practical matter, the heart of the government's case was that in-home physical therapy treatments—even if approved by a licensed physician—were fraudulent because they were provided without the over-the-shoulder physician supervision required for reimbursement under Medicare Part B.

### 1.     Getting Started

Prince worked with a doctor who had a physical medicine practice before starting his first physical therapy business with two colleagues. Then, in September 1998, joining with Dr. Dennis Youngblood (Youngblood), Prince opened Care Rehabilitation (Care Hab) to provide physical therapy services—such as electrical stimulation, ultrasound, massage, gait training, etc.—to homebound Medicare beneficiaries in Dallas, Texas. This company, like the rest to follow, targeted Medicare beneficiaries, had a physician certify them as "homebound," and delivered physical therapy services according to treatment plans prepared by Michael Prince. Defendant was not involved when Care Hab opened, but came into the picture when the next company opened in Dallas.

Specifically, in February 1999, the defendant joined Prince, Youngblood, and Dempsey in forming Donnsey Recovery Services, Inc. (Donnsey), to provide home-based physical therapy services to Medicare patients in Dallas, Texas. A medical doctor was hired to perform physicals and take medical histories, which were forwarded to Prince for him to prepare the prescription treatment plans. One licensed physical therapist supervised five physical therapy assistants who provided the services to the

patients. Although Donnsey told Medicare that it would do its billing "in-house," Rhonda Foote (who had Medicare billing experience) and Carla Prince, Prince's wife, started Foote Prince Billing to do the Medicare billing in exchange for a percentage of the receipts. Day-to-day operations were handled by Dempsey, and the defendant was responsible for bookkeeping and payroll. The billing and bookkeeping arrangements would be repeated at other companies.

Three other physical therapy businesses were started in Texas during 1999. Kysa Health Care and Rehabilitation Services was started by Prince, Carla Prince, Rhonda Foote, and Dr. Youngblood, in Houston, Texas; Rancho Grande Rehabilitation Services was started by Prince, Youngblood, and Romiro Mejia in McAllen, Texas; and Solday Rehabilitation Services was formed by Prince, Youngblood, his brother David Youngblood, and Sol Burke in San Antonio, Texas. For each of these enterprises, doctors performed physicals, took histories, and certified patients as homebound. The histories and physicals were sent to Prince (typically by fax and at times to his parents' home where the defendant also lived). Prince wrote the treatment plans, and the physical therapy services were provided without direct physician supervision. In June 1999, Prince formed Prince Consulting, Inc., to receive distributions from all of the physical therapy companies. Defendant, while not a principal of these companies, began doing the bookkeeping for Prince Consulting.

### 2.     Dockery Letters

Defendant argues that these businesses were not opened with an intention to defraud Medicare, emphasizing that in March 1999 Prince and Youngblood engaged a healthcare attorney named James Dockery to investigate whether their businesses were operating in compliance with Medicare regulations. Dockery prepared a compliance manual and a set of forms that were presented to employees. The government did not contend otherwise, but argued that an exchange of correspondence between Dockery and Medicare representatives between July and September 1999 put the defendant (and others) on notice that the procedures being followed did not comply with the requirements for reimbursement from Medicare.

Specifically, a newsletter sent to providers by Medicare in June 1999 raised concern with Prince and Youngblood about whether they were in compliance. On July 1, 1999, Dockery wrote to Medicare indicating that his clients wanted to know whether the operating procedures employed at Solday and Donnsey were appropriate for reimbursement from Medicare. In that letter, Dockery represented that a physician prescribed the treatment plan and that the services were provided by licensed physical therapists outside the presence of a physician. In a letter dated July 8, 1999, Medicare responded that the physician provider number could be used to claim reimbursement *only if* the physician provided direct supervision by being physically present when the service was provided by the physical therapist. Michael Prince testified that this letter was shared with the principals of Donnsey, including specifically the defendant.

In addition, Medicare issued a separate Notice of Suspension to Care Hab, Solday, and Donnsey, stating that an independent investigation found multiple irregularities. Dockery sent a letter on July 29, 1999, requesting that the suspension be lifted, and stated in a follow-up letter dated August 13, 1999, that the companies were taking action to comply. Dockery also represented that doctors had recently begun providing direct supervision of the staff, which Michael Prince testified was not true.

Medicare's response, dated September 7, 1999, explained that its investigators had determined that physicians were not supervising the physical therapy and that, as a result, Care Hab, Solday, and Donnsey were not entitled to any reimbursement for their services. The letter also stated that overpayments had resulted from billing by "modality," or area of treatment, instead of by the total number of minutes spent with each patient. It was further explained that, as billed, the technician would have been required to spend four to six hours with each patient, while interviews with patients indicated that the treatments actually took one to one-and-a-half hours. Darryl Dempsey and Foote Prince Billing were doing the Medicare billing for these companies.

Defendant argues that Dockery's letter of inquiry did not accurately describe the operations at Donnsey because, at least at one time, Donnsey provided services in a common room with multiple tables and an on-site physician. Be that as it may, Donnsey

was closed and there is no suggestion that this model was followed elsewhere. Moreover, the Dockery letters and the Notice of Suspension were relevant to the question of notice because they explicitly advised that a doctor must have been physically present when the services were provided to be reimbursable under a physician provider number. It also provided notice that incorrect billing practices were resulting in substantial overpayment by Medicare.

Finally, defendant argues that even if there was notice, there was insufficient evidence to establish that this information was shared with him. In fact, Michael Prince testified not only that the information was shared with the owners of Donnsey, including the defendant, but also that he handed copies of these letters to the defendant. In addition, there was contradictory evidence about whether the defendant was present during a meeting with Dockery to discuss these matters. Michael Prince testified that the defendant was present, while Dockery said he was not. In determining the sufficiency of the evidence, however, we may not assess the credibility of the witnesses or reweigh the evidence.

### 3.       Post-Suspension

The suspension of Medicare payments to Care Hab, Solday, and Donnsey forced those businesses to close in September 1999, but did not discourage the opening of other physical therapy businesses. Notable among them were two companies that formed on September 15, 1999. One, Tender Care Restorative Healthcare Services (Tender Care) took over Care Hab's location, and the other, Share Care Health Center (Share Care) took over Donnsey's location. Prince testified that Tender Care and Share Care opened with new provider numbers, but continued to operate in the same way as their predecessors with in-home services provided by technicians without direct physician supervision. Share Care, like Donnsey, was owned by the defendant, Prince, Youngblood and Dempsey. The billing was again done by Foote Prince and Darryl Dempsey. Defendant was responsible for handling the bookkeeping for these two companies. Prince testified that the defendant wrote the checks for Share Care, including payroll, so he knew that Share Care was still operating with only two doctors

and five or six technicians.  Prince also admitted that they said they would do whatever Dockery told them was necessary to comply with Medicare.

CPA Rod Ciccone, who had done accounting for Dr. Youngblood's dental clinics,  testified that he was initially hired by the defendant to do tax work for Care Hab and Donnsey, but became involved in coordinating the dissolution of the companies that were suspended and had payments terminated by Medicare.  At defendant's direction, Ciccone completed dissolution documents with the State of Texas for Care Hab, Donnsey, Share Care, and Tender Care.  As proof of defendant's knowledge, the government relies on the fact that, in February 2000, defendant told Ciccone that Donnsey was being dissolved because "Medicare Part B reimbursement changes and additional regulations on health services that Care Habilitation and Donnsey provided, forced the companies to cease operations in 1999."

Several other companies would be opened that operated in the same way. Defendant was an owner of one, Hampton Healthcare Services, which opened in October 1999.  Defendant handled the bookkeeping for Hampton, as well as for Shreveport Physical Health Center, Illinois Physical Health Center, and Alpha Healthcare Services Incorporated.  By April 2001, Tender Care, Share Care, Hampton, Shreveport, and Alpha were suspended from Medicare and closed.  Ciccone arranged with the defendant for the sale of equipment from Donnsey to Share Care, from Share Care to Hampton, and from Tender Care to Illinois Physical Health.

Testimony from Pam Sampson, who was the incorporator and manager of Alpha Healthcare in Opelousas, Louisiana, provided additional evidence that defendant knew the operations there, and elsewhere, were fraudulent.  Sampson testified that Prince, whom she believed to be a doctor, invited her to incorporate Alpha in June 2000.  It is undisputed that Alpha operated in substantially the same manner as the other companies, including that the technicians provided the services without direct supervision by a doctor.  Sampson testified that she spoke to the defendant almost daily concerning financial matters, and he told her what checks to write and handled the payroll.  The

government argues that defendant would have known from the ratio of doctors to technicians that direct supervision was not being provided.[1]

Sampson contacted Medicare with some questions, and was visited by a Medicare representative who explained to her that Medicare regulations required that a physician be present, in the home or with the technician, when the technician was performing physical therapy treatments. Sampson spoke to both the defendant and Prince about this meeting, and told them that the solution was to hire more doctors. One more doctor was hired, but Alpha continued to operate as it had until it received a Notice of Suspension on April 20, 2001. That notice, which Sampson testified she read to the defendant and Michael Prince over the telephone, stated that the suspension was based on an investigation that found irregularities in the claims and "reliable information that fraud and/or willful misrepresentation may exist in your treatment and/or billing activities." Defendant directed Sampson to deposit any Medicare checks, add his name to the bank account, and contact Ciccone to dissolve the corporation. Prince then asked Sampson to come to work for Brittsen.

### 4.        Brittsen and TLR

Brittsen was formed in May 1999 and began operating in July or August 1999, about the same time that Dockery was corresponding with Medicare about the procedures being used at Care Hab and Donnsey. As noted earlier, Brittsen and TLR were located in Memphis, Tennessee. Watts was recruited by Dr. Dancy—a pediatrician friend of her father's from his days in medical school—to take over his practice after she completed her residency in 1998. At a reception to welcome Watts to Memphis, Watts and Prince met and talked with Dr. Reggie Northcross about starting a physical therapy business in Memphis. Watts and Prince misrepresented Prince to be a doctor with experience, if not expertise, in physical medicine. Although the defendant was

---

[1]Prince indicated that this location had been selected in order to claim an exemption from the direct-supervision requirement because of its designation by the state as an underserved area. However, Alpha was not deemed to be exempt because the area was not considered to be underserved by Medicare. Assuming that defendant was aware of this strategy, it does not contradict the evidence that defendant knew what the requirements were. If anything, it implies avoidance of a known requirement, rather than good faith belief that they were in compliance.

apparently not at that party, he was present for a later discussion with Northcross and Prince about the specifics of opening such a business in Memphis.

Northcross testified that he and two other doctors whom he hired would perform physicals and take histories, which were faxed to Prince who prepared the prescription treatment plans. The treatment orders were returned to Brittsen and signed by one of the doctors. Unlicensed technicians were sent out to provide the in-home physical therapy treatments without direct physician supervision. Watts claimed ignorance of the direct-supervision requirement, as did Northcross, although Prince testified that he, Dempsey, and the defendant knew Brittsen was not in compliance. Watts admitted that she and Prince agreed to pay kickbacks to Steven Threet to procure patients, but did not implicate the defendant in that arrangement. Watts later discovered that Dempsey was overbilling Medicare for more time than the technicians were spending with patients, and brought this to the attention of the defendant and Prince.

Watts's husband David started out handling the day-to-day matters at Brittsen, under the close direction of the defendant and Michael Prince. After David Watts stopped working for Brittsen, the defendant would instruct Dr. Watts on what checks were to be written to whom. Watts testified that, although the defendant was not a principal, she could not make any purchases without the defendant's permission. Defendant prepared financial reports for the principals of Brittsen on a weekly basis showing Medicare payments, expenses, and distributions. The defendant was later added as a signatory to Brittsen's bank account. On Prince's advice, Watts created Watts Consulting Services to receive compensation from Brittsen. Defendant handled the bookkeeping for Watts Consulting, which paid him for his services. Billing was done by Foote Prince, and then by Carla Prince's successor company, Infinity Associates Incorporated.

In March 2001, as Alpha Healthcare Services was about to be suspended, Brittsen had too many patients. Tender Loving Rehabilitation (TLR) was formed with the defendant, Prince, Watts, Dempsey, and Sampson as principals. Dr. Dwight Moore (Moore) was recruited to serve as medical director, and he hired two other doctors who

actually did the physicals and patient histories. TLR used the marketing brochure from Brittsen, which was created at Donnsey, and used the same forms and procedures that were in place at Brittsen. Again, as with the other physical therapy businesses, the doctors did patient histories and physicals, and the forms were faxed to Prince who prepared the treatment plans that were faxed back to TLR. One difference at TLR was that Moore admitted to signing the prescription treatment orders in blank for the sake of convenience, instead of signing them after they had been filled out by Michael Prince. There is no dispute that the physical therapy services were provided by unlicensed technicians outside the presence of a physician. Dempsey handled the day-to-day operations at TLR, and the billing was done by Infinity Associates. Defendant did the bookkeeping for TLR and was a signatory on its bank account.

Fraud investigations led to the execution of search warrants at Brittsen in February 2002 and at TLR in April 2002. The scope of the fraud is reflected in the fact that Brittsen collected more than $1.85 million for nonreimbursable services from Medicare in 2001 alone, and paid more than $1 million total in consulting fees divided among the defendant, Dempsey, Watts Consulting, and Prince Consulting (with the most going to Prince and Watts).[2]

## B.    Analysis

There is ample evidence that Brittsen and TLR were engaged in Medicare fraud in the delivery of and payment for physical therapy services, most pervasively by systematically billing and receiving payment from Medicare for in-home physical therapy services performed by unlicensed technicians without the direct physician supervision required for reimbursement under Medicare Part B. The Dockery letters and the Notice of Suspension establish notice of the direct-supervision requirement. Prince testified that the defendant was told about and given copies of the correspondence, and conflicting evidence about whether the defendant was also at a meeting with Dockery at which these matters were discussed goes to the weight and not the sufficiency of the

---

[2]The defendant received more than $280,000 in compensation from Brittsen, TLR, Foote Prince Billing, Infinity Associates, Watts Consulting, and Prince Consulting.

evidence.  Defendant argues that he was involved as a principal of Donnsey, which operated at times somewhat differently by having a doctor in the room where several patients were receiving treatment.  As noted earlier, that does not change the fact that Donnsey was suspended, in part, for making claims for services that were provided without that direct supervision.

As the district court observed, defendant's explanation to Ciccone of the reason for the dissolution of Care Hab and Donnsey corroborates that the defendant knew the payments were suspended for failure to comply with Medicare regulations.  Any question about whether defendant understood the requirement, or that the manner in which the businesses operated did not satisfy it, is resolved by Sampson's testimony that she told the defendant about the compliance problem at Alpha, that she told the defendant it could be rectified by hiring more doctors, and that she read the suspension notice to the defendant over the telephone.

That leaves defendant's further contention that he did not know that Brittsen and TLR were operating in the same way.  It is clear that the defendant was not directly involved in the provision of physical therapy services, or the actual submission of the claims for payment to Medicare.  Indeed, the defendant was acquitted of charges that he committed or conspired to commit health care fraud.  There was sufficient evidence, however, that the defendant *knew* that Brittsen and TLR were committing Medicare fraud.  The strongest evidence, although circumstantial, is defendant's participation as a principal or bookkeeper in the successive and overlapping physical therapy businesses that had roughly the same operational structure and utilized uneven ratios of doctors to technicians, which would not allow for direct physician supervision.  Defendant knew by September 1999 that Medicare had suspended payment where the same structure was used because there was no direct supervision of the therapists.  Viewing the evidence in the light most favorable to the prosecution, we find a reasonable juror could conclude that defendant knew this was going on at Brittsen and TLR as well.

The evidence at trial was sufficient to establish that the defendant committed, or conspired to commit, money laundering by conducting, or aiding and abetting another

in conducting, the specified financial transactions knowing that they involved the proceeds of Medicare fraud.[3]

**III.**

**A.     Recusal**

In the first of the remaining claims of error, defendant asserts a due process violation resulting from the district judge's failure to disqualify himself *sua sponte* from deciding the motion for new trial because doing so required him to assess the credibility of Michael Prince, a key government witness, when that witness was being represented by an attorney who had previously represented the district judge in an unspecified judicial misconduct proceeding before this court. Specifically, the defendant argues that the appearance of partiality arises because the district court expressly declined to discredit the testimony of Michael Prince—who was the only witness to testify that the defendant was advised of the contents of the Dockery letters—in concluding that the verdict was not against the weight of the evidence.

Pursuant to 28 U.S.C. § 455(a), a federal judge is obligated to disqualify himself "in any proceeding in which his impartiality might reasonably be questioned." This requires recusal "if a reasonable, objective person, knowing all of the circumstances, would have questioned the judge's impartiality." *Johnson v. Mitchell*, 585 F.3d 923, 945 (6th Cir. 2009) (internal quotation marks and citation omitted). Here, defendant offers no reason, beyond the alleged fact of the prior representation, to suspect bias against the defendant or favoritism toward the witness. Nor is there any suggestion that the prior proceeding was related in any way to this case. A reasonable person would not question the judge's impartiality toward the defendant because a government witness was represented by an attorney who previously represented the judge in a prior unrelated matter. *See id.* at 946 (noting that "we have consistently held that a judge need not

---

[3]Defendant notes on appeal that he did not actually write the checks on the Brittsen account that were associated with counts 15-25. There was testimony from Dr. Watts, however, that even before defendant took over the check writing for Brittsen in early 2001, it was the defendant who told Watts or her husband what checks to write to whom and for how much.

recuse himself on the basis of prior contact with a party or a witness, as long as the judge does not have a familial, financial, or similarly close relationship with the party or witness and as long as the judge has not received out-of-court information about the case at hand").

To the extent defendant is claiming a denial of due process, the Supreme Court has recognized that "'most matters relating to judicial disqualification [do] not rise to a constitutional level.'" *Caperton v. A.T. Massey Coal Co.*, 129 S. Ct. 2252, 2259 (2009) (quoting *FTC v. Cement Inst.*, 333 U.S. 683, 702 (1948)). Due process will require recusal when a judge has "a direct, personal, substantial, pecuniary interest in a case," and when, as an objective matter, "'experience teaches that the probability of actual bias on the part of the judge or decision maker is too high to be constitutionally tolerable.'" *Id.* (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). Defendant fails to demonstrate a constitutionally intolerable probability of actual bias in this case.[4]

**B.      Pretrial Discovery of Exhibit List**

Finally, defendant argues that the district court erred by not requiring the government to specifically identify the exhibits it intended to introduce at trial from among the estimated 70,000 pages of discovery material that was provided to the defendant. Defendant concedes that, beginning in 2005, the government provided scanned copies on CD-ROM of all the documents seized from Brittsen and TLR. The government indicated to defense counsel and the court that the trial notebooks would be made available for review, but not copying, two weeks before trial. When that time came, however, defense counsel was unavailable on the date proposed, and the government was unwilling to make the notebooks available on the date defense counsel requested. One week before trial, defendant filed a motion to compel compliance with

---

[4]Defendant sees an appearance of bias in the judge's credibility determination, which acknowledged the defendant's arguments but expressly declined to discredit Michael Prince's testimony. A judge is free to assess the credibility in deciding a challenge to the weight of the evidence and, indeed, the defendant argued strenuously that the witness should not be believed. *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007). Defendant has abandoned any separate claim that the district judge erred in finding that the evidence did not preponderate heavily against the verdict. On appeal, however, our review would be limited to whether the district court's determination in that regard was a clear and manifest abuse of discretion. *Id.*; *see also United States v. Smith*, 601 F.3d 530, 543 (6th Cir. 2010).

Fed. R. Crim. P. 16, asking that the government be required to identify its trial exhibits by "CD number, volume, folder, and scan image number." The government opposed the request, and the motion was denied.

Defendant relies on Rule 16(a)(1)(E)(ii), which provides that, upon request, the government "must permit the defendant to inspect and to copy or photograph" documents if it is "within the government's possession, custody, or control," and "(ii) the government intends to use [them] in its case-in-chief at trial." Defendant's true complaint is not a failure to make the documents available, however, and Rule 16 does not entitle a defendant to pretrial disclosure of the government's exhibit list. The district court did not abuse its discretion by refusing to require the government to provide one in this case. *See United States v. Kincaide*, 145 F.3d 771, 780 (6th Cir. 1998) (applying abuse-of-discretion standard).

## IV.

Accordingly, defendant's convictions for money laundering and conspiracy to commit money laundering are **AFFIRMED.**