NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0102n.06

No. 22-5729

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| CHARLES ELSEA, Jr., | ) | |
| Defendant-Appellant. | ) | |
| | ) | OPINION |
| | ) | |

**FILED**
Mar 07, 2024
KELLY L. STEPHENS, Clerk

Before:  BATCHELDER, GRIFFIN, and LARSEN, Circuit Judges.

ALICE M. BATCHELDER, Circuit Judge.  While serving a life sentence in a Tennessee state prison, Charles Elsea orchestrated the distribution of over fifty-six kilograms of methamphetamine throughout Tennessee. He later directed a subordinate to start growing marijuana in Michigan to sell in Tennessee. A jury in the United States District Court for the Eastern District of Tennessee convicted him of two counts of conspiring to distribute controlled substances and one count of conspiring to commit money laundering. The district court then imposed a within-guidelines life sentence to run consecutively to the one Elsea is already serving. Elsea appeals, alleging five errors in his trial and sentencing, and his treatment as a pro se litigant. Finding no error, we affirm.

**I.**

**a.  Background**

In 1998, Charles Elsea, Jr., received a sentence of life imprisonment after a jury in Tennessee state court found him guilty of first-degree murder. While in the custody of the

Tennessee Department of Corrections, Elsea founded and oversaw two drug-distribution operations—one that distributed methamphetamine throughout Tennessee, and the other that aimed to distribute marijuana (grown in Michigan) throughout Tennessee. He reinvested the proceeds into procuring more drugs, with the stated goal of making one million dollars in profit. To achieve his aims despite his incarceration, Elsea directed the actions of numerous others, many of whom testified against him at trial. His instructions came through cell phones that had been smuggled into prison.

Corrie Bush testified that she supplied Elsea with contraband cell phones. Using the cell phones, Elsea directed Bush to set up two marijuana grow operations in Tennessee. After those fell through, Elsea had her exchange money in California for methamphetamine that she would then bring back to Tennessee. However, in January 2016, police in Oklahoma caught Bush with seventeen pounds of methamphetamine. Due to the resulting criminal charges, Bush could no longer serve as Elsea's courier. So it fell to someone else to manage importing methamphetamine.

Denise Froelich stepped into that role, serving as Elsea's primary money-runner from December 2016 to February 2019. Elsea sent her money electronically, which she would then deliver to others. Eventually Froelich also oversaw packaging methamphetamine for delivery even though she usually did not bring it back to Tennessee herself. As Elsea instructed, she would package the methamphetamine in vacuum-sealed bags and put grease between the drugs and the bags to make detection by drug-sniffing dogs less likely. She made between fifteen and twenty trips to California or Arizona, each time taking between $75,000 and $145,000 and receiving between ten and twenty pounds of methamphetamine. Eventually, she too caught the eye of police, who arrested her in Arkansas in February 2019. Although they were in separate vehicles, she was travelling back to Tennessee with her husband, who had nineteen pounds of methamphetamine.

All together, Froelich estimated that she packaged between sixty and a hundred pounds of methamphetamine and handled over $500,000 in cash.

Robert Leeper helped to oversee the distribution side of the methamphetamine conspiracy. He broke down the larger packages of methamphetamine into smaller quantities to sell to street-level dealers and users. Leeper would then reinvest the proceeds from these sales into the operation to obtain more methamphetamine to sell. Elsea would tell Leeper whether he should give the money to other conspirators to bring to California to purchase more drugs or place the money in specified bank accounts for Elsea to use to pay his suppliers. Elsea and Leeper made an agreement to keep reinvesting the money into the methamphetamine conspiracy until they acquired a million dollars in profit. Leeper would also provide Froelich with addresses whenever they used FedEx to mail the methamphetamine. Elsea provided Leeper with these shipping addresses and arranged for others to retrieve the packages as soon as they were delivered to their destinations. Elsea also provided him with specific rules of conduct to help the conspiracy escape detection. Leeper estimated that, over the course of the conspiracy, he sold between 200 and 250 pounds of methamphetamine. Leeper split the profits with Elsea evenly.

James Payne belonged to a rival gang. After Payne was released from prison, his gang leader instructed him to work for Elsea. Payne started off obtaining small quantities of methamphetamine before eventually securing between ten and forty pounds at a time. During his last deal for Elsea's organization, Payne purchased forty pounds of methamphetamine for $180,000.

Eventually, Elsea and others decided to expand operations into distributing marijuana. In 2016, Elsea directed Bush to create a marijuana grow-house in Tennessee, but spider mites destroyed most of the marijuana plants before they could be harvested. Elsea considered having

Bush or Froelich create a marijuana grow-house in California, but that plan did not materialize. In 2020, Tiffany Williams finally set up a marijuana grow-house in Michigan for Elsea. Elsea instructed Williams how to find the right property, grow the marijuana successfully, and escape detection by the police by claiming that high electric bills came from on-site welding. Elsea discussed all of this on recorded jail calls. Michigan State Police shut down the marijuana operation in December 2021 after catching co-conspirators trying to transport marijuana to Tennessee. Police seized thirty-two mature marijuana plants, five juvenile marijuana plants, and over 118 grams of harvested marijuana.

Elsea faced three charges at trial: (1) conspiring to distribute at least fifty grams of methamphetamine in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(A)(viii); (2) conspiring to distribute at least one hundred kilograms of marijuana in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(B)(vii); and (3) conspiring to launder proceeds from that drug-trafficking in violation of 18 U.S.C. § 1956(a)(1)(A)(i). Elsea waived his right to counsel and demanded to proceed pro se. After conducting a colloquy, the district court permitted him to do so and appointed elbow counsel to assist Elsea. At one point, Elsea filed a motion seeking appointed counsel to help him look into potential violations of the Interstate Agreement on Detainers Act. The motion emphasized that Elsea was "not triggering any action at this time other than" seeking the appointment of counsel. But the district court, recognizing that Elsea unequivocally asserted his right to proceed pro se, construed the motion as a request for counsel to represent him in a civil suit. So the district court denied the motion.

The jury convicted Elsea of the methamphetamine-trafficking-conspiracy charge and the money-laundering-conspiracy charge, and it convicted him of a lesser-quantity variant of the marijuana-trafficking-conspiracy charge.

**b. Sentencing Hearing**

Elsea made seventeen objections to the Presentence Investigation Report. Several objections related to the probation officer's trial-testimony description, which Elsea alleged was inaccurate. The district court overruled Elsea's factual objections because it found that the probation officer's recollection of the evidence in the case aligned with the district court's recollection and contemporaneous notes. The district court also found the information in the PSR consistent with the unofficial transcript of court proceedings. So the district court overruled Elsea's factual objections to the PSR's recitation of trial testimony.

Beyond his factual objections, Elsea objected to every aspect of his offense-level calculation. First, he objected to the amount of drugs informing his base offense level. According to Elsea, much of the methamphetamine referenced at trial came from unspecified other sources. But the district court noted that Elsea's base offense level would be thirty-eight so long as the case involved at least four and a half kilograms of actual methamphetamine. And the district court found evidence sufficient to establish that Elsea's conspiracy distributed much more than that amount. It found evidence sufficient to show at least the following: four and a half kilograms of methamphetamine confiscated by the Tennessee Highway Patrol in July 2017; eight to ten pounds of methamphetamine (just under five kilograms) confiscated from a conspiracy member arrested while transporting drugs on a train; and testimony from Payne indicating that he increased from purchasing one pound of methamphetamine to buying between five and ten pounds at a time, and even purchasing forty pounds once (totaling at least twenty kilograms). It also noted that the amount of money confiscated at various points and the $4,500-per-pound price Elsea paid for methamphetamine supported such an offense level. Police arrested one co-conspirator with $119,000 in cash, representing twenty-three pounds of methamphetamine (over ten kilograms),

and another co-conspirator with $20,000 in cash, representing slightly less than two kilograms of methamphetamine.

The district court observed that "there's nothing here to suggest that any of [the methamphetamine] quantity was attributable to any unnamed sources" besides Elsea. Instead, it noted that there was, "in all likelihood, more than a hundred kilograms of actual methamphetamine clearly attributable" to Elsea. Because it found that the amount of methamphetamine attributable to Elsea clearly exceeded the four and a half kilograms necessary to result in a base offense level of 38, it overruled Elsea's drug-weight objection.[1]

Elsea also objected to the enhancement for maintaining premises for the purpose of manufacturing a controlled substance. He claimed that advising someone to grow marijuana in a state where it is legal to do so cannot be a federal crime. The district court summarily rejected that argument because, regardless of how Michigan law treats growing marijuana, it remains illegal under federal law. It also noted that the Michigan operation was not the only time Elsea maintained premises for the purpose of manufacturing a controlled substance. Bush had also testified that Elsea paid for her to rent a location in Tennessee to grow marijuana. Each of those events sufficed to apply the premises enhancement to Elsea's conduct. So the district court overruled the premises objection.

Finally, Elsea objected to an enhancement for obstructing justice with respect to the investigation and prosecution of his counts of conviction. Specifically, the PSR recounted that Elsea (1) instructed co-conspirators how to conceal drug activities from law enforcement officers and to use burner phones to avoid detection; (2) made false statements during trial by stating that

---

[1] The district court also conducted fact-finding relating to the amount of marijuana attributable to Elsea. But because the amount of methamphetamine attributable to Elsea clearly exceeds the threshold for a base offense level of thirty-eight, we need not address this calculation.

police coerced the witnesses into testifying against him and that the money that came from the conspiracy had been in his account since 2010; and (3) spoke to two co-conspirators about cooperating witnesses and shared discovery information—including the identities of cooperating witnesses—with members of his gang. The district court noted that it was unnecessary to resolve this objection because, no matter how the district court ruled, Elsea's adjusted offense level would be capped at forty-three by the guidelines. U.S.S.G. § 5A, n.2. However, the district court indicated for the record that it would deny the enhancement because of the latitude afforded to Elsea by proceeding pro se—even though the witnesses may have felt intimidated. After ruling on Elsea's objections, the district court determined that Elsea's total offense level was forty-three and that his criminal history score of five placed him in criminal history Category III. The guideline sentence for Elsea was life.

Elsea also raised his concerns about potential violations of the IADA. Specifically, he wanted the district court to help him understand whether he was subject to a "writ of habeas corpus ad prosequendum." The district court responded that it was not the district court's job to help Elsea understand something like that. Later in the hearing, Elsea said that he wanted to make a motion to dismiss his charges due to a violation of the IADA. The district court refused to rule on Elsea's oral motion at sentencing.

Both the government and Elsea argued to the district court their preferred weighing of the sentencing factors. The government argued for a life sentence because of the drug conspiracy's massive scope and to provide as strong a deterrent effect as possible. Elsea, acknowledging that he was already serving a life sentence, simply asked the district court to run his federal life sentence concurrently to his state one. After listening to the parties' statements, the district court imposed a

life sentence and ordered that it run consecutively to Elsea's state sentence. Before doing so, it discussed the sentencing factors at length.

The district court first focused on the seriousness of the offense. It noted that Elsea ran "one of the most significant drug[-]trafficking conspiracies" that it had ever seen, and he did so from inside state prison. Elsea directed all aspects of the conspiracy, providing day-to-day instructions to each co-conspirator. And the conspiracy distributed, even at a very conservative estimate, more than fifty kilograms of actual methamphetamine, a highly addictive drug that inflicts significant damage on Tennessee communities, families, and residents.

The district court also observed that Elsea demonstrated "absolutely no respect for the law." He "violated the law at will," and violated the rules of the facilities in which he was incarcerated. And the district court observed that all of the evidence indicated that Elsea was likely to continue his illegal activities if he returned to a state prison. For this reason, the district court determined that only a life sentence could possibly deter Elsea from committing similar crimes in the future, even though the district court worried that even such a sentence would not deter him. Additionally, the district court noted that only a life sentence would promote respect for the law by showing Elsea and the community that Elsea's conspiracy resulted in a significant sentence. And the district court noted that Elsea did not provide anything from his personal history or background that would mitigate the need to impose a life sentence.

In determining to run the federal sentence consecutively to Elsea's state sentence, the district court noted that the drug conspiracy bore no relation to the murder for which Elsea was serving his state sentence. The district court thus determined that the federal government has an independent sovereign interest to hold Elsea accountable for his drug conspiracy. The district court

rejected Elsea's attempt to "make [him]self the victim of [his] own crime" by claiming to be a victim of government persecution.

Ultimately, the district court imposed a life sentence on the methamphetamine-conspiracy count and 240-month sentences on the money-laundering-conspiracy and marijuana-distribution-conspiracy counts. The district court ordered that the federal sentences would run concurrently with each other but consecutively to Elsea's state sentence. It also imposed a total of five years of supervised release, with a special condition for Elsea to submit his person, house, property, vehicle, and papers to searches conducted by a probation officer. The district court waived all fines due to Elsea's inability to pay, and it expressed its sincere hope that Elsea would serve his sentence in a federal facility isolated from his gang and with no access to contraband cell phones. The district court also entered the forfeiture order for $1,263,490 that the government requested and that Elsea did not contest.

Recognizing that Elsea vowed to appeal, the district court ordered the clerk to file a notice of appeal on Elsea's behalf.

## II.

Elsea makes five arguments in favor of reversal. First, he claims the government failed to prove that there was a promotional-money laundering conspiracy that Elsea joined. Second, he claims that the methamphetamine-conspiracy count and the marijuana-conspiracy count are multiplicitous such that one must be dismissed. Third, he claims—although he never objected—that the district court erred by treating the methamphetamine as "actual methamphetamine" without discussing its purity. Fourth, Elsea alleges that his life sentence is substantively unreasonable. And finally, Elsea claims that the district court erred by not addressing his claim of an IADA violation. We take each argument in turn.

### a. Sufficiency of the Evidence

Elsea's first argument is that the evidence at trial failed to prove the existence of a promotional money-laundering conspiracy or that Elsea joined it. This requires Elsea to show that "no 'rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Miller*, 982 F.3d 412, 439 (6th Cir. 2020) (quoting *United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019)). In other words, we ask whether "the government's case was so lacking that it should not have even been submitted to the jury." *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (citation omitted). We employ a "strong presumption in favor of sustaining a jury conviction," *United States v. Peters*, 15 F.3d 540, 544 (6th Cir. 1994), and we will not reverse the conviction unless the defendant meets that "very heavy burden," *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006) (citation omitted).

"To establish a money[-]laundering conspiracy, the government must prove (1) that two or more persons conspired to commit the crime of money laundering, and (2) that the defendant knowingly and voluntarily joined the conspiracy." *United States v. Prince*, 618 F.3d 551, 553–54 (6th Cir. 2010). To prove promotional money laundering, the government must show that the defendant "(1) conducted a financial transaction that involved the proceeds of an unlawful activity; (2) knew the property involved was proceeds of unlawful activity; and (3) intended to promote that unlawful activity." *United States v. Warshak*, 631 F.3d 266, 317 (6th Cir. 2010) (citation omitted). The "paradigmatic" example is when a drug dealer uses the proceeds of selling illegal drugs to purchase additional drugs and consummate future sales. *Id.*[2] This promotes the conspiracy by "allowing it to continue or grow." *United States v. Tolliver*, 949 F.3d 244, 248 (6th Cir. 2020).

---

[2] Elsea cites out-of-circuit precedent applying a different test. *See United States v. Castro-Aguirre*, 983 F.3d 927, 942 (7th Cir. 2020). As Elsea recognizes, we are bound by our own precedent.

Ample evidence shows that Elsea engaged in a promotional-money-laundering conspiracy. Robert Leeper testified that Elsea directed him to reinvest the proceeds from selling methamphetamine into obtaining more methamphetamine to sell. Leeper stated that Elsea would tell him whether to funnel the money to methamphetamine suppliers in California through co-conspirators or through the bank accounts that Elsea used to pay his suppliers electronically. And Leeper said he and Elsea made an agreement to keep reinvesting the money into the methamphetamine conspiracy until he and Elsea made a million dollars in profit. Elsea's contention that the government never showed he and Leeper had a "meeting of the minds" to engage in promotional money laundering is contradicted by Leeper's direct testimony. *See United States v. Wheat*, 988 F.3d 299, 307 (6th Cir. 2021). Because the evidence is sufficient for the jury to conclude beyond a reasonable doubt that Elsea engaged in money laundering, we reject Elsea's invitation to vacate it.

### b. Multiple Conspiracies

Elsea next argues that the district court should have dismissed either the methamphetamine-conspiracy count or the marijuana-conspiracy count as multiplicitous. He did not raise this argument below, so we review it for plain error. *United States v. Kennedy*, 743 F. App'x 649, 654 (6th Cir. 2018). This requires him to show (1) an error; (2) that is clear or obvious; (3) that affects his substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Johnson v. United States*, 520 U.S. 461, 466–67 (1997); *Puckett v. United States*, 556 U.S. 129, 135 (2009).

Charges are multiplicitous when a single offense is charged in more than one count of an indictment. *United States v. Swafford*, 512 F.3d 833, 844 (6th Cir. 2008). To determine whether charges are multiplicitous, we use the *Blockburger* test, "which asks whether each charge requires

proof of a fact that the other charge does not." *United States v. Myers*, 854 F.3d 341, 355 (6th Cir. 2017) (citing *Blockburger v. United States*, 284 U.S. 299 (1932)). If each charge requires proof of a fact that the other charge does not, then the charges are not multiplicitous. *Id.*

Here, each of the two charges required the government to prove a fact that the other charge did not. To prove Elsea engaged in a conspiracy to distribute methamphetamine, the government needed to show that Elsea agreed to distribute fifty grams or more of methamphetamine. 21 U.S.C. § 841(b)(1)(A)(viii). To prove Elsea engaged in a conspiracy to distribute marijuana, the government needed to show that Elsea agreed to distribute one hundred kilograms or more of marijuana. *Id.* § 841(b)(1)(B)(vii).[3] Each charge requires the government to prove a fact that the other charge does not—the drug that Elsea and his co-conspirators chose to distribute. So the charges are not multiplicitous under the *Blockburger* test.

However, we have sometimes held that when two conspiracy charges involve the same location, participants, and date, the correct charging unit is one conspiracy even if that conspiracy distributes multiple types of drugs. *Maxwell v. United States*, 617 F. App'x 470, 473 (6th Cir. 2015). We examine five factors to determine whether the government has properly charged two separate conspiracies: (1) the time over which each conspiracy occurs; (2) the persons acting as co-conspirators; (3) the statutory offenses charged; (4) the overt acts indicating the nature and scope of each conspiracy; and (5) the places where the events took place. *United States v. Vichitvongsa*, 819 F.3d 260, 273 (6th Cir. 2016).

In this case, the methamphetamine conspiracy and the marijuana conspiracy differ significantly enough to make the correct charging unit two conspiracies. First, consider the time

---

[3] That the jury ultimately convicted Elsea of a lesser-included amount of marijuana does not change this analysis.

of each conspiracy. The methamphetamine conspiracy ran approximately from 2016 to 2021. But the marijuana conspiracy arose in 2020, when Elsea had Williams establish a marijuana grow house in Michigan. And that conspiracy lasted only until December 2021, when the police caught the co-conspirators trying to transfer the marijuana to Tennessee. Even the earlier attempt to construct a Tennessee marijuana operation took place only in 2016. In essence, while the methamphetamine-distribution conspiracy operated continuously over the five-year period, the marijuana-distribution conspiracy took place in 2016 and in 2021. This factor supports charging the conspiracies as two separate ones.

The remaining factors support this decision too. The methamphetamine-distribution conspiracy involved Elsea, Leeper, Froelich, and Payne, among others. The marijuana-distribution conspiracy featured Elsea directing either Bush or Williams. Even if there was some overlap— most significantly, Elsea's directing each conspiracy—the personnel were different enough to support charging two counts of drug-distribution conspiracies. And our analysis using the *Blockburger* test shows that the statutory crimes are different too, as are the overt acts and the locations in which the acts took place: For the methamphetamine-distribution conspiracy, Elsea and associates trafficked methamphetamine from Arizona or California to Tennessee. For the marijuana-distribution conspiracy, Elsea and different associates tried to start marijuana grow houses in Tennessee or Michigan (for eventual import back into Tennessee). Each of these factors supports the conclusion that Elsea oversaw two conspiracies, not one.[4] We are convinced that the correct charging unit here is two conspiracies, so we reject Elsea's argument.

---

[4] Elsea argues that one conspiracy should not be converted into multiple ones simply because a defendant does not know the exact drug sold by other conspirators. *See United States v. Sadler*, 24 F.4th 515, 541 (6th Cir. 2022). That contention is irrelevant here because the trial testimony showed that Elsea oversaw each conspiracy and knew which drugs each conspiracy distributed.

## c. Drug-Amount Calculation

Elsea next claims that the district court erred when calculating his base offense level by treating the methamphetamine amounts as actual methamphetamine without making explicit findings as to its purity. But Elsea never requested that the district court do so. We typically review drug-quantity challenges for clear error. *United States v. Olsen*, 537 F.3d 660, 663 (6th Cir. 2008). But when, as here, a defendant does not raise the drug-quantity challenge below, we review the district court's drug-quantity calculation for plain error. *United States v. Vonner*, 516 F.3d 382, 385–86 (6th Cir. 2008) (en banc).

Here, it was not plain error for the district court to treat the methamphetamine that Elsea and his co-conspirators distributed as pure methamphetamine. District courts may accept "any undisputed portion of the presentence report as a finding of fact." Fed. R. Crim. P. 32(i)(3)(A). So when Elsea failed to object to the PSR's treatment of the methamphetamine as actual methamphetamine, the PSR's calculation was "no longer [a] mere allegation[] but became [an] admission[] sufficient to support factual findings relevant to sentencing without the need for any independent factual finding." *United States v. Davy*, 713 F. App'x 439, 448 (6th Cir. 2017). The district court did not need to make a finding as to the type of methamphetamine when the government and Elsea agreed with the PSR's treatment of the methamphetamine as actual methamphetamine.

Moreover, the trial testimony shows that the methamphetamine was pure methamphetamine. John Bulla, an agent with the Department of Homeland Security, testified that the methamphetamine conspiracy trafficked in "crystal methamphetamine." This is enough for the district court to conclude that the methamphetamine in this case is "pure" or "actual" methamphetamine. *See* U.S.S.G. § 2D1.1(c), n.(B)–(c) (discussing three different categories of

methamphetamine). Froelich also testified that the methamphetamine she trafficked consisted of "clear, white-looking crystals." With two witnesses—and the parties—treating the methamphetamine as pure, the district court did not commit plain error by doing the same.

Finally, even if the district court did err by treating the methamphetamine as a purer form of methamphetamine, such error could only be harmless because it would not produce a different base offense level. *United States v. Volkman*, 797 F.3d 377, 399–400 (6th Cir. 2015). Assuming Elsea's conspiracy distributed only a methamphetamine mixture, he would receive the same base offense level of thirty-eight if the conspiracy distributed more than forty-five kilograms of that mixture. *See* U.S.S.G. § 2D1.1(c)(1), n.(A). The PSR made very conservative estimates yet still attributed more than fifty-six kilograms of methamphetamine to the conspiracy. And the district court properly recognized that the evidence produced at trial indicated that Elsea's conspiracy distributed much more methamphetamine than that—perhaps as much as one hundred kilograms. The district court's determination of the amount of methamphetamine attributable to Elsea can be nothing worse than harmless error, and in all likelihood, it too was a conservative estimate.

### d. Substantive Reasonableness of Consecutive Life Sentence

Elsea also argues that his within-guidelines consecutive life sentence is substantively unreasonable. We review whether a sentence is substantively reasonable using a deferential abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 41 (2007). A sentence is substantively reasonable when it is "proportionate" to the seriousness of the circumstances of the offense and is sufficient but not greater than necessary to comply with the sentencing factors. *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008) (citation omitted). And a sentence that falls within the guidelines receives a rebuttable presumption of reasonableness. *Vonner*, 516 F.3d at 389.

Under this standard, Elsea's consecutive life sentence is eminently reasonable. Elsea ran a conspiracy that imported an astounding amount of methamphetamine into Tennessee. He twice planned to distribute marijuana alongside methamphetamine, the later time trying to abuse Michigan's marijuana laws to grow marijuana to bring back to Tennessee. And he did all of this while serving a life sentence in a Tennessee prison. As the district court properly noted, Elsea earned his life sentence, and anything less would engender a lack of respect for the law among Elsea, his co-conspirators, and the public.

The cases Elsea cites for comparison do not change our analysis. The two drug-conspiracy cases Elsea cites involved guideline ranges much lower than calculated here. *See United States v. Mosley*, 53 F.4th 947, 964 (6th Cir. 2022) (guidelines maximum of just over thirty years' imprisonment); *United States v. Matthews*, 31 F.4th 436, 457 (6th Cir. 2022) (guidelines maximum of nine years' imprisonment). *Mosley* involved a simple operator in the drug conspiracy, not its leader, *see* 53 F.4th at 963, and the defendant in *Matthews* was a drug courier, not the leader, *see* 31 F.4th at 444–45. In this case, Elsea's guideline sentence was life in prison, and the evidence established that he stood atop each conspiracy, controlling everything.

Nor was it error in any way for the district court to impose the federal life sentence to run consecutively to Elsea's state life sentence. The record does not support Elsea's contention that the district court produced a "dearth of findings" as to why it ran the sentence consecutively. To the contrary, the district court properly recognized that the federal government has a sovereign interest in punishing Elsea for violating its drug laws that is separate and distinct from Tennessee's interest in punishing Elsea for murder. And, of course, Elsea operated his drug conspiracies while incarcerated in a Tennessee prison. So the district court produced ample support for its imposing Elsea's federal life sentence to run consecutively with his state one. *See* U.S.S.G. § 5G1.3(a)

(recommending a consecutive federal sentence when the defendant committed a federal crime while serving a state sentence).

We reject Elsea's argument that his consecutive life sentence is unreasonable. Instead, we find that the district court properly explained the need for the sentence under the appropriate sentencing factors.

#### e. Interstate Agreement on Detainers Act Claim

Finally, Elsea claims that the district court should have addressed his claim that the government violated the Interstate Agreement on Detainers Act. Broadly speaking, the IADA aims to foster greater cooperation between states and the speedier resolution of detainers by establishing standards for bringing to trial individuals removed from the custody of one state by a detainer. *See United States v. Faught*, No. 21-6123, 2022 WL 2813240, at *5–6 (6th Cir. July 19, 2022). Our court has not yet conclusively identified the standard of review for IADA claims. *See id.* at *6 (citing *United States v. White*, 185 F. App'x 504, 507 (6th Cir. 2006)). We do not decide this question now either, as Elsea never properly raised his IADA claim below.

Elsea chose to proceed pro se. The district court conducted a colloquy and permitted Elsea to do so after confirming that he knowingly and intelligently waived his right to counsel. Elsea later filed a pro se motion asking the district court to appoint counsel "pertaining to violations" of the IADA. Importantly, Elsea's pro se motion stated that he was "not triggering any action at this time other than appointment of counsel." The district court denied the motion because Elsea unequivocally asserted his right to proceed pro se. Elsea claims the district court's denial constitutes reversible error, but we disagree.

Because Elsea proceeded pro se, his filings "will be accorded a measure of leniency." *Wolfel v. United States*, 711 F.2d 66, 67 (6th Cir. 1983). But that does not mean that we interpret

pro se motions to contradict their express language. And Elsea's pro se motion mentioning the IADA clearly stated that he was not seeking any action other than to receive appointed counsel. Our precedents clearly establish that rights under the IADA "are waived by forfeiture or default if not raised prior to or during trial." *United States v. Eaddy*, 595 F.2d 341, 346 (6th Cir. 1979). Elsea's motion did not raise any claim, as he simply wanted the district court to appoint an attorney to help him with "possible" violations.

Elsea says that he raised his IADA claim orally during a status hearing in January 2022. But Elsea's statements were ambiguous at best. He mentioned the IADA and stated, "I'd like to make sure that I get a fast and speedy trial." He did not indicate to the district court that he was seeking a dismissal of his case based on the IADA. The district court acted within its discretion when it responded to Elsea's ambiguous comments by stating that it could not give Elsea advice on the issue.

Finally, at sentencing, Elsea asked the district court "for a motion to dismiss [his] charges due to the violation" of the IADA. But by that time, he had forfeited his IADA claim. IADA claims "must be raised before trial" under Federal Rule of Criminal Procedure 12. *Eaddy*, 595 F.3d at 346. Thus, any rights under the IADA not raised "prior to or during trial" are forfeited. *Id.* Because Elsea never timely raised his IADA claim, we reject the IADA claim on appeal too.

**III.**

For the foregoing reasons, we affirm Elsea's convictions and sentence.